Covington *v.* Anderson.

T. H. COVINGTON *et al. v.* JAMES A. ANDERSON *et al.*

1. TRUST FUNDS, CONVERSION OF. *Liability for.* If one acting as trustee convert the trust property without authority, he is responsible, and he who purchases from him, or aids in the conversion, with a knowledge of the want of authority, or under circumstances that will reasonably put one upon inquiry as regards the authority to sell or convert, is also liable.

2. NOTICE, WHAT IS. Whatever is sufficient to put one upon inquiry, is notice of all the facts which would be discovered by a faithful prosecution of such inquiry.

---

FROM SHELBY.

---

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

W. S. FLIPPIN, POSTON & POSTON and METCALF & WALKER for complainants.

WRIGHT & FOLKES, CLAPP & BEARD and MORGAN & McFARLAND for defendants.

TURNEY, J., delivered the opinion of the court.

Henry O. Woodward died in Shelby county, in 1869. He had a policy of insurance on his life for $20,000. He left a widow who, shortly after his death, gave birth to a daughter. His will contains the following clauses: "I give and bequeath to my dear beloved wife, Sallie F. Woodward, for her support and the support and education of her child by me begotten, all the interest that may accrue on the remainder of the insurance that may be due my estate."

"The balance of the insurance money that may be due my estate, after the paying of my just debts, to be invested in United States interest bearing bonds (gold), with coupons attached, interest payable semi-annually. These coupons to be given to my wife, Sallie F. Woodward, as they fall due, for her support and the support of her child by me begotten."

"Fifth, when the child of my wife, Sallie F. Woodward, by me begotten, shall arrive at the age of twenty-one years, the said United States bonds are to be divided between the said child and its mother, Sallie F. Woodward, equally, provided the said Sallie F. Woodward shall not have married again. If she has, then she, Sallie F. Woodward, is only to receive one-third of said bonds, and the said child two-thirds."

The will was proven in November, 1869. Marcus E. Cochrane, the nominated executor, qualified. He invested $16,656.20 in three United States five twenty registered bonds of $5,000 each. They were payable on their face to M. E. Cochrane, executor or assignee. He collected and paid over the interest, as it became due, to Mrs. Woodward. He died in May, 1873. On September 9th thereafter, James A. Anderson, claiming to be public administrator for Shelby county, filed a petition in the county court, claiming that the law made it his duty to apply for administration *de bonis non* with the will annexed of the estate of Woodward, and letters of administration were issued to him. The administratrix of Marcus E. Cochrane turned over to Anderson the three bonds, which her in estate had left on deposit in the Union and Planters Bank of Memphis.

In December, 1876, Anderson carried two of the bonds, endorsed by him in blank, to Garth, president of the German National Bank of Memphis, and requested him to effect a sale of them through his bank for him, Anderson, saying he wanted to invest for a better interest, and showing to Garth a paper from the treasury department at Washington to the effect that, as successor of Cochrane in the administration of the estate of Woodward, he had the power to transfer the bonds. The German National Bank sent them to the Chemical National Bank in New York to sell, accompanying them with the memorandum or paper from the treasury department to Anderson. An officer of the proper department at Washington wrote to the latter bank that there was satisfactory power on file in the office in favor of the right to dispose of the bonds, but if preferred, the department would take up the bonds and issue new ones in their stead, payable to the bank or its assigns. This was done, and the substituted bonds were sold by the bank and the proceeds remitted to the German National Bank, which placed them to the individual credit of Anderson. In January, 1877, the third bond was sold and converted in the same way. The proceeds of the bonds were paid out to Anderson on his individual checks. The banks charged and received a commission on the sales. Anderson appropriated the proceeds of the bonds to his own use.

This bill is filed to have Anderson, and his sureties on his public administrator's bond, and the two banks and Garth, account. The theory of the bill

is, that Garth and the banks colluded with Anderson in the conversion of a trust fund, or aided in the sale of the bonds, with knowledge, actual or constructive, of the trust upon them.    The contest is abandoned as to the sureties of Anderson.

The question to be decided is, did Garth and the banks receive the bonds and dispose of them, under circumstances showing that a breach of trust was meant by Anderson, or under such circumstances as should have put them upon inquiry as to his title to the bonds, and the motive prompting him to offer them for sale.    While much has been written by courts upon what shall constitute notice, actual or constructive, it has been pretty universally said that no fixed rule can be established, and that each case must stand upon its peculiar facts.    The facts here are:  In 1869, the will of Woodward directed a fund to be invested in bonds for a specific purpose.    His executor did so invest, and the bonds were made payable to M. E. Cochrane, executor, or assignee, and registered.    A part of the interest had been collected by him as directed. The executor died in May, 1873, with the bonds in his possession, and with no assignment upon them. His administratrix turned the bonds over to Anderson, who carried them to the German National Bank, with blank endorsements upon them.    That bank doubted the ownership of Anderson, or his right to dispose of them, as is distinctly shown by its letter to the Chemical Bank.    That doubt was created by the name of the payee and the other facts appearing on and in the bonds.    The same doubt was also entertained by the

Chemical Bank, as evidenced by its letter to the treasury department. Both saw on the face of the bonds that something substantial was lacking to make out a rightful possession and power of disposition on the part of Anderson. The bonds were offered to the banks more than seven years after the probate of the will of Woodward, and more than three years and a half after the death of Cochrane, when there could have been no available claim against the estate of Woodward, and when, we must presume, administration on the estate of Cochrane had been settled. At the time of the offer, Anderson told the president, Garth, that he wanted to sell that he might invest the proceeds so as to secure a higher rate of interest. With the consent, and for the accommodation of the New York bank, the agent of the Memphis bank, the bonds were taken up and others issued to that bank directly. These facts when grouped, it seems to me, are little short of notice that Anderson held the bonds not as administrator, but for a trust created by the will. With all these facts, the Memphis bank received the money, placed it to the individual credit of Anderson, and paid it out on his individual checks.

A bare inspection of the bonds would have naturally suggested the inquiries: Of whom was M. E. Cochrane the executor? Of whose estate is Anderson administrator? Why is there no assignment on the bonds? How came Anderson by them? By what authority does Anderson propose to dispose of bonds that have been created by will, when he is not the executor of that will nor the assignee of such executor?

Why have the bonds been kept off the market so long? For whose benefit does Anderson propose to invest in securities at a greater rate of interest, and why should he do so when the bonds are a certain security when all others fail? Can Anderson, not being the executor or trustee named in Woodward's will, sell? These suggestions would have led at once to an inspection of the records, which would have discovered that Anderson had no right whatever to manage or control the bonds, and that his purposes were anything but honest. It was impossible to have read the bonds, however casually, without discovering that there was a trust of some character impressed upon them, which trust could be ascertained by reference to the will. They bore the unmistakable brands of the rights of ownership of others, without the slightest evidence of claim of any character on the part of Anderson. The bankers were interested in the conversion to the extent of the remuneration received for making the sale. The opinion of the treasury officer in Washington can avail nothing. His mistake of law or fact furnishes no ground of relief. Besides, his was not the office to consult. In taking up the original bonds, earmarked with a trust, and issuing others to the bank with the trust left out, he made himself a party to the conversion. The consent to, and acceptance of, such issue, was a positive conversion on the part of the bank.

The case of *Gray* v. *Johnson*, 3 House of Lords Cases, page 1, I do not think is sound, but if it is, it is distinguishable from the one before us. In that

case, the executrix had the fund under the will, had the right to manage it for her own use during life, and after her death it was to be divided among her children as she might think fit. In the opinion stress is laid upon the fact that it would be a great hardship on the bankers to hold them for a conversion. I think the facts, while nothing like so strong as here, make a clear case of conversion by which the bankers collected a sum due them. The rule is, that if one acting as trustee convert the trust property without authority, he is to be held responsible, and he who purchases from him, or aids him in the conversion, with a knowledge of the want of authority, or under circumstances that will reasonably put him upon inquiry as to the authority to make sale or conversion, is also liable. The numerous authorities cited agree to this as the true rule. Then the question recurs, does the facts of this case fix a liability on the defendants? We think they do.

The defendants can not deny a knowledge of the terms of the bonds. They certainly saw, and by their respective letters admitted, that these terms did not invest Anderson with any title, or even a right of possession. They saw that the bonds were registered and long outstanding; that they were payable to Cochrane, executor or assignee, and that no assignment had been made. They were, by all the facts and circumstances, put upon inquiry, and did make a partial inquiry of the office at Washington. They are conclusively presumed to have known that any information they received from the Washington correspond-

ent must have been based upon information derived from Memphis, where the records were, and they must be also presumed to have known that the only reliable source of information for them was in those records. Surely, it can not be that they are to be excused upon the ground that they passed by the only reliable evidence, and adopted in its stead, and acted upon the conclusion, without any statement of facts, of one not authorized to construe the records. They were aware that Anderson had furnished the only information upon which the Washington correspondent acted, as they say themselves that Anderson exhibited a paper or memorandum from the treasury department at the time he applied to sell the bonds.

This fact, connected with the reply of the Washington correspondent, that Anderson, as the successor to Cochrane, had the right to control the bonds, made it plain that it was their duty to have examined into the fact whether he was the successor, when they would have proved he was not. Although the evidence furnished may have satisfied the writer of the memorandum or paper that Anderson was the successor, it does not satisfy the law, and was not such as is admissible in the courts. This ignorance of law will not excuse the conduct of the defendants.

These complainants were no parties to the transactions between the banks and Anderson; they had no notice of his officious and dishonest intermeddling; they were *non sui juris*, while the defendants were not only *sui juris*, but were men of business education and habit of thought, engaged in an occu-

pation that required them to inquire into the rights of those with whom they were dealing. Here they dealt recklessly and under circumstances that should have made them pause and investigate. If there is hardship, it was brought about by their loose dealing, and if a doctrine of hardship is to be invoked, it should be visited upon those who have brought it about, and not upon the innocent and unconsulted mother and child, who are attempted to be deprived, by the conduct of the dishonest Anderson and haz arding bankers, of the benefits conferred by the will of the husband and father. That the banks were honest and meant to do no wrong to the rights of others, can not change the result, the facts showing that they did not practice the precaution imposed by law. The facts were sufficient to put them upon notice, and that they so construed them is evidenced by their expressed unwillingness, in their correspondence, to be held liable for "irregularity in papers."

The German National Bank, forwarding the bonds, says to its agent, Chemical Bank at New York: "We do not wish to be responsible after paying funds over here for any irregularity in papers," and the Chemical Bank saying to the Register of the Treasury: The German National Bank request us to sell, "but distinctly state they do not wish to be responsible after paying the funds over for any irregularities in papers, which I herein enclose. We desire to comply with the wishes of the 'German National,' but do not wish to become responsible for regularity."

This language is a strong exposition of the appre-

hension of the banks that there was a want of au-
thority in Anderson, and that the papers (*i. e.* the
bonds) were sufficient to put them upon inquiry as
to the ownership of the bonds and the character of
the holding, not only of Anderson, but of the executor
under whom he claimed. "The rule upon the ques-
tion of notice is, that whatever is sufficient to put a
person upon inquiry, is notice of all the facts to
which that enquiry will lead, when prosecuted with
reasonable diligence and in good faith": 2 Lead. Cases
Part 1, 109; Hilliard on Vendors, 408.

With the confessed admonition, the conduct of de-
fendants was "a fraudulent turning away from a
knowledge which the *res gestæ* suggested to a prudent
mind": 1 Haw., 43; 1 Story Eq., secs. 399, 400;
2 Lead. Eq. Cases, Part 1, 167.

The discrepancy in the character of the bonds
purchased by the executor and those directed by the
will to be purchased, is a question in which the ex-
ecutor and beneficiaries were alone concerned. None
except the beneficiaries could have taken advantage of
it. The record shows that the bonds were purchased
with the purpose of carrying out the provisions of
the will; that the beneficiaries have ratified the pur-
chase by receiving the interest and by the institution
of this suit.

The bonds were personal property, easy of identifi-
cation. In fact, their identity is not controverted.
If at any time their possession could have been traced
to the Memphis bank, the New York bank, or to
their assignees, then, under the proof disclosed in the

record, the law would have, at the instance of com-
plainants, compelled their restoration to the beneficia-
ries, regardless of the loss that might have resulted
to the wrongful holder. The bonds having been
shown to have been in the possession of these banks,
which have improperly disposed of them by conversion
into money, the banks must account for that money.
Through their wrong, the bonds have been placed
beyond the reach of the rightful owners. They are
responsible for that wrong to the value of the bonds,
with interest from the conversion.

The decree of the chancellor is reversed, the report
of the Referees rejected, and a decree for complainants
against the banks. Garth having acted not for himself
but as the representative of the German National
Bank, no relief is granted against him personally.

FREEMAN, J. dissenting.