**Paula V. BRADFORD and William Bradford, Plaintiffs/Appellees,**

v.

**CITY OF CLARKSVILLE, Tennessee, Defendant/Appellant.**

Court of Appeals of Tennessee, Western Section, at Nashville.

June 3, 1994.

Application for Permission to Appeal Denied by Supreme Court Aug. 22, 1994.

W. Timothy Harvey, Suzanne G. Marsh, Daniel, Harvill, Batson & Nolan, for defendant/appellant.

Carmack C. Shell, Roger A. Maness, Mark, Shell, Maness & Marks, for plaintiffs/appellees.

FARMER, Judge.

Appellees, Paula and William Bradford, filed suit pursuant to the Governmental Tort Liability Act, T.C.A. § 29–20–101, et seq., against Appellant, the City of Clarksville (City), alleging that Mrs. Bradford sustained permanent injuries when a defective gas and/or water meter cover gave way under her step causing her to fall. The complaint alleges that the City "owned, maintained and controlled" the meter "through its Gas, Water and Sewer Department" and that the accident proximately resulted from the City's failure to repair the defective cover. The Bradfords further alleged that the City had actual or constructive notice of the defect prior to the date of the accident on December 2, 1989. Mr. Bradford sought $50,000 in damages for the loss of services and consortium of his wife and the medical expenses incurred on her behalf. Mrs. Bradford sought damages totalling $150,000.

The City denied liability, pleading the defense of governmental immunity. It contended, inter alia, that it had neither actual nor constructive notice of any alleged defect and that, if any defective condition should be proven, it was latent. The City filed a motion for summary judgment, based in part on its assertion of governmental immunity, which was denied by the trial court. A bench trial proceeded with the City moving to dismiss at the close of the Bradfords' proof. This motion was also denied. No further evidence was presented. The trial court found the City liable and determined that the Bradfords' total damages were $30,-000. The court concluded, however, that

Mrs. Bradford was 20% negligent. Judgment was subsequently entered for $24,000.[1]

The City presents the following issues for our consideration:

I. Whether the trial court improperly denied the Defendant's motion for summary judgment?

II. Whether the trial court erred by not dismissing the Plaintiffs' action after a trial on the merits?

III. Whether the trial court erred by accepting the testimony of Charlie Foust as an expert?

Appellees present the following additional issue:

I. Whether the trial court erred by not granting an adequate judgment to plaintiffs?

■ The City contends that the trial court erred in denying its motion for summary judgment. A trial court's denial of a motion for summary judgment, predicated upon the existence of a genuine issue of material fact, is not reviewable on appeal when a judgment is subsequently rendered after a trial on the merits. *Hobson v. First State Bank,* 777 S.W.2d 24, 32 (Tenn.App.1989).

■ The City next contends that the Bradfords failed to prove the requisite statutory elements[2] and, as such, the trial court erred in failing to dismiss the action at the close of proof. In *Catt v. Catt,* 866 S.W.2d 570 (Tenn.App.1993), this Court stated:

But in the non-jury case, when a motion to dismiss is made at the close of plaintiff's case under Rule 41.02(2), the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and, if the plaintiff's

case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits, or, the trial judge, in his discretion, may decline to render judgment until the close of all the evidence. The action should be dismissed if on the facts found and the applicable law the plaintiff has shown no right to relief.

*Catt,* 866 S.W.2d at 572 (quoting *City of Columbia v. C.F.W. Constr. Co.,* 557 S.W.2d 734 (Tenn.1977)).

Mrs. Bradford described the incident by stating that she left her father's business, known as the Hee–Haw Shop, to purchase a cup of coffee at a cafe located "right around the corner in the back of [her] father's shop." After purchasing the coffee, she proceeded back toward her father's business, crossing Legion Street. Next, she states, "I remember looking to the sidewalk . . . to step up on the sidewalk. And as I was walking, it was almost like the ground gave way underneath my foot . . . and I just—I fell forward." Mrs. Bradford was questioned as to whether she was able to determine what caused her to fall, to which she replied, "I mean, I noticed the lid. I heard it clank. I remember it clanking . . . when I fell. So by that time . . . I knew what had happened."

Charles Foust, Jr., president of Clarksville Foundry, Inc., testified that he examined the meter box in question in February 1992. He stated the rim "is the device that accepts the cover in the closed position. It's cast in the sidewalk in concrete." He stated that "[t]he rim and cover are designed to hinge in such a way that the cover closes on the rim properly" and that the hinging mechanism on the rim contained "a couple of broken parts that were no longer present." He further testified that the "moving part" of the hinge located in the cover was "incompletely

---

1. This Court, by order entered August 9, 1993, remanded the case to the trial court to amend the judgment so as to allocate the judgment in separate amounts to the individual plaintiffs. The trial court subsequently entered an order allocating $20,000 in damages to Mrs. Bradford and $4,000 to Mr. Bradford.

2. T.C.A. § 29–20–203 provides:

(a) Immunity from suit of a governmental entity is removed for any injury caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway, owned and controlled by such governmental entity. . . .

(b) This section shall not apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved. . . .

formed." Foust stated that the parts that were missing served to guide the cover to a proper closure. If the lid is closed on the subject meter box, the hinge is not capable of holding it in place without its "counterpart" on the other side of the cover, "which acts as a latch to hold it down." Foust opined that the rim had been broken "for quite some time," possibly exceeding 20 years. When asked what he based his opinion on, he stated:

> Well, a fresh fracture in cast iron has a very distinct appearance. It's kind of a gray or sometimes a little shiny appearance. Cast iron rusts very slowly. It rusts much more slowly than steel does. And based on the fact that it had rusted over and the thickness and condition of the rust, that's what I base it on.

Foust stated that the cover he examined bore a patent number which patent provides for a locking mechanism on the underside of the cover. This locking mechanism is the "counterpart" Foust referred to as necessary for the hinge to hold the lid in place.

On cross-examination, Foust stated that the broken pieces do not support the rim that holds the lid when it is closed. Consequently, the lid "can be placed within its seat in the rim without the guidance of the hinge...." He agreed that without the lock, the hinge, broken or otherwise, adds no stability to the lid if seated properly within the rim. When asked whether the lid, if seated properly, would have the same stability as the "vast majority of the meter lids that are in the market today," Foust responded, "I would have to say no, based on the fact that the rim underneath is not—doesn't have the height of some of the ones you see today." Foust stated that he answered differently in his deposition because "[i]t simply didn't occur to [him]." He continued that since being deposed, he looked at numerous other patterns for meter lids and determined that there is one feature (a deeper rim) that "would possibly make another type of meter

lid more secure in its seat."[3] As to the meter lid in question, Foust stated, "it doesn't have the—any features at all projecting from the underside of the surface as high as what would be seen on ... currently manufactured items...." He stated that the cover was not designed to have these interior flanges, which act to "keep the thing within its center position." However, he commented that if the locking device on the cover were functional, the flanges would not be necessary. Foust agreed that locking mechanisms are not used in currently manufactured manhole covers.

Mike Hutchinson testified that he has been employed by the City as a gas and water meter reader for five years. He was responsible for reading the meter in question between July and December 1989. When asked, "[d]uring the period of time you've been affiliated with the city Gas and Water Department reading meters, are you aware that the condition of that meter has ever changed," Hutchinson answered, "I'm not aware that it has ever changed." He was asked to describe the procedure he uses "to ensure [the lid's] proper seating in the rim." He stated: "In order to put it back and seat it properly, I had to put the hinge in first. It has to seat in the hinge and then set it down. And then we check and make sure it's seated all the way around." The examination continued as follows:

> Q. Do you note any characteristics, ... that are different about this rim and other rims in regard to stability if they are both seated properly as you've described the way you would seat them?
>
> A. There is no difference if they're seated properly.

Hutchison further stated that he was never given a key to unlock the meter.

The trial court found that the meter box lid was "dangerously defective" and that the City had both actual and constructive notice of the defect. Our review of the trial court's

---

**3.** The record reveals that the City moved to strike Foust's testimony regarding this "new opinion" as it was not learned before the trial in December 1992. The Bradfords countered that an affidavit by Foust filed in September 1992 reads: "[t]hat since the hinge on the [meter lid] is broken and it has no other protective feature to keep the lid from slipping, it is not as secure, even when seated properly, as the meter lids which are currently manufactured." Foust's deposition was taken in July 1992. The trial court overruled the City's objection to the testimony.

findings of fact is governed by T.R.A.P. 13(d) which directs us to review this case *de novo* upon the record, accompanied by a presumption of correctness of the findings, unless the evidence preponderates otherwise. We conclude that a preponderance of the evidence supports the findings of the trial court. According to Foust's testimony, the meter box cover in question was not as stable or secure as those with a deeper rim or flange. However, he stated that such would not be necessary if the lid included a properly functioning locking mechanism. The meter cover in question possessed neither.

As to notice, Foust testified that the rim had been broken for quite some time, possibly exceeding twenty (20) years. Hutchinson testified that the meter is read "once a month" and that the cover has been in the same condition during the entire time that he has worked for the City. In *Glover v. Hardeman County*, 713 S.W.2d 73 (Tenn. App.1985), this Court discussed the requirement of notice, stating:

> In *Texas Co. v. Aycock*, (June 1950), 190 Tenn. 16, 227 S.W.2d 41, 46, the court considered what constituted notice under the law of Tennessee. There the court stated:
>
>> In our State, as far back as the case of *Woodfolk v. Blount*, 4 Tenn. 147, 151, 9 Am.Dec. 736, it was held: "When anything appears which would put a man of ordinary prudence upon inquiry, the law presumes that such inquiry was actually made, and therefore fixes the notice upon him as to all legal consequences".... In *Covington v. Anderson*, 84 Tenn. 310, 319, the rule is thus stated: "The rule upon the question of notice is, that whatever is sufficient to put a person upon inquiry, *is notice of all the facts to which that inquiry will lead*, which prosecuted with reasonable diligence and in good faith." (Emphasis supplied.)
>
> If the rule were not as stated by the cases to which reference has just been made, a reward would often result by declining to make inquiry about a matter as to which a party was given notice. This is emphasized in the quotation from

21 Am. & Eng.Ency. of Law (2 Ed.), 584 made in the case of *War Finance Corp. v. Ready*, 2 Tenn.App. 61, 67. That quotation is: "Means of knowledge with the duty to using them are deemed equivalent to knowledge itself, and *passive good faith will not serve* to excuse wilful ignorance." (Emphasis supplied.)

*Glover*, 713 S.W.2d at 76. The evidence is undisputed that the rim on the meter box was broken and that the locking mechanism did not function. We conclude that these defects, which the evidence reveals to have existed for a number of years, were sufficient to put the City upon inquiry as to the stability and security of the meter box cover.

■ The City further assigns as error the trial court's acceptance of Foust's testimony as an expert. It contends that Foust was not qualified to testify as to the design requirements of the meter lid and specifically points to the following testimony:

Q. But you do not have any expertise in the design and the safety requirements of pedestrian manhole covers other than just comparing them to others that you make. Is that correct?

A. Well, I think I can go a little further than that.

Q. On what basis? What have you done other than compare it to other manhole covers that you have made?

A. Well, I can draw you a picture that would demonstrate the effectiveness of those extended projections.

. . . .

Q. What I'm saying is, though, you're not familiar with any appropriate regulatory standards or design standards which say as a matter of safety standards you've got to have a flange there or you've designed it improperly. You don't have any expertise in that, do you?

A. No, I'm not familiar with the standards but I can tell you how deep would be effective as far as keeping it in place.

. . . .

Q. And you have no expertise in analysis of what is an appropriate standard for different types of use, placement and so

forth; you simply know the effect of the design.

A. None other than my experience in dealing with these products.

Foust further testified that he has been employed at Clarksville Foundry since 1978 and has been its president since 1981. He has a Bachelor's degree in mechanical engineering from the University of Tennessee. After earning his degree, he immediately began working for the foundry, a family business in which he "grew up." His current responsibilities are "primarily administrative." He stated that currently the foundry's "major market" is machine components for "various manufacturers," but it has manufactured municipal castings including meter lids for sixty or seventy years.

■ To qualify as an expert, a witness should have "some special as well as practical acquaintance with the immediate line of inquiry." *Benson v. Fowler*, 43 Tenn.App. 147, 306 S.W.2d 49, 63 (1957) (quoting *Powers v. McKenzie*, 90 Tenn. 167, 16 S.W. 559, 562 (1891)). The trial judge has broad discretion in the conduct of the trial and in dealing with the qualifications and admission of testimony of expert witnesses. *Cordell v. Ward School Bus Mfg., Inc.*, 597 S.W.2d 323, 327–28 (Tenn.App.1980). This Court will not reverse the trial court's judgment regarding whether a witness is an expert unless the lower court was in error as to the witness's qualifications and that error was prejudicial. *Underwood v. Waterslides of Mid–America, Inc.*, 823 S.W.2d 171, 182 (Tenn.App.1991). We find no error by the trial court in allowing the expert testimony of Foust. The fact that he testified that he was unfamiliar with meter cover design standards merely goes to the weight of his testimony. In fact, this is the alternative position taken by the City in its brief.

■ The Bradfords request this Court to modify the judgment so as to increase the amount of their awards. They insist that the trial court erred in finding Mrs. Bradford negligent and that they were, otherwise, inadequately compensated. On cross-examination, Mrs. Bradford testified as follows:

Q. .... you walked on this sidewalk from the Hee–Haw Shop, ... or a right turn out of the door, a right turn down the corner and toward this cafe on the sidewalk that would have these two manhole covers in it.

A. Yes.

Q. And you did not notice anything wrong with the manhole covers at that time.

A. No.

Q. .... And I think you told me earlier that you had your coffee in one hand and you had your money and change in the other hand.

A. If that's what I told you.... but, I believe that's the way it is.

Q. You come out of the cafe and you step up on the sidewalk.

A. Yes.

Q. You recall seeing and making that elevation step.

A. Yes, I do.

Q. .... as you're walking down the sidewalk, you don't even realize you're about to put one of your feet on a manhole cover; is that correct?

A. Yes.

....

Q. .... When you put your right foot down, you don't have any idea you're stepping onto a manhole cover or to the sidewalk or the concrete or anything; is that correct?

A. You mean did I notice whether I put my foot on a cover or on—

Q. Yes.

A. No, I didn't notice.

■ The general rule is that "a citizen walking along a street does not have to keep his eyes on the pavement all the time; he may presume the city has done its duty. It is not negligence to fail to look for danger which under the surrounding circumstances he had no reason to apprehend." *Morrow v. Town of Madisonville*, 737 S.W.2d 547, 549 (Tenn.App.1987) (quoting *Batts v. City of Nashville*, 22 Tenn.App. 418, 123 S.W.2d 1099 (1938)). We conclude that the evidence preponderates against the trial court's finding that Mrs. Bradford was negligent.

The Bradfords further contend that they were inadequately compensated. In awarding damages, the trial court relied, in part, upon the deposition of Dr. W. Cooper Beazley. Dr. Beazley testified that he is an orthopedic surgeon who first treated Mrs. Bradford in August 1989 regarding pain in her knees. He felt that she "had some overuse and some early arthritis in her knees at that point." He prescribed medication for arthritis and recommended a continued weight loss and exercise program and alternative employment, in something other than working in a restaurant.[4] He first treated Mrs. Bradford after the accident in January 1990 and diagnosed her as having an "aggravation of a preexisting problem with her knee" and a grade one separation of the shoulder. An arthroscopic meniscectomy was ultimately performed. Mrs. Bradford was rehospitalized after developing thrombophlebitis which she developed "probably from the surgery," according to Beazley. Within a reasonable degree of medical certainty, Beazley stated that the primary cause for the surgery was that she had a torn lateral meniscus which he felt "had occurred with a traumatic event or an injury ... which by her history was where she fell through the manhole cover." He stated that the likelihood of future surgery is "pretty high."

On cross-examination, Beazley stated that Mrs. Bradford's weight, her type of work and the congenital defect caused a "deterioration of the knee." Prior to the accident, Beazley would have assessed a permanent impairment rating of ten percent (10%). The trauma altered her prior condition and Beazley assessed a ten percent (10%) impairment increase to the lower extremity. He opined that Mrs. Bradford should be able to work in a situation where she is not required to stand on her feet. Beazley stated that, even without the injury from the fall, there was a probability of future surgery. He concluded, "the only thing the accident might do maybe is ... to hasten that ... but the [pre-accident and post-accident periods] are just so intertwined, it's impossible to separate

them." Mrs. Bradford will continue to have discomfort in the future as a result of the accident. Beazley stated that his charges for the treatment of Mrs. Bradford after the fall in December 1989 totaled $3,048 and were necessary and reasonable.

Mr. Bradford testified that after the accident it was "three months ... more or less" before his wife was able to "get about" without his assistance. He stated that, as of the time of trial, "[s]he is the same person other than activity."

The record contains a stipulation by counsel that the Bradfords incurred medical expenses totaling $7,083.58 in connection with her treatment at Clarksville Memorial Hospital and the services provided by Radiology Associates of Clarksville and Dr. B. Tillman Hall. Based upon the forgoing testimonies, as well as the entire record in this case, we find no error by the trial court in its assessment of damages.

The judgment of the trial court is modified to the extent that judgment be entered for plaintiffs in the amount of $30,000, to be allocated $25,000 to Paula Bradford and $5,000 to William Bradford. The judgment is otherwise affirmed. Costs are taxed to the City of Clarksville for which execution may issue if necessary.

TOMLIN, P.J. (W.S.) and HIGHERS, J., concur.

---

4. Mrs. Bradford testified that from the middle 1970s until mid 1989, she "mostly worked at a cafe," cooking, waiting tables and washing dishes. She also stated that at one time she weighed 360 pounds, but that in the summer of 1989 she was close to her "goal weight" and had lost down to 160 to 170 pounds.