FILED
02/22/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 7, 2017 Session

## RONALD OSBORNE, ET AL. V. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**Appeal from the Circuit Court for Davidson County**
**No. 15C320      Hamilton V. Gayden, Jr., Judge**

_____

### No. M2017-01090-COA-R3-CV

_____

A patron at a convenience center owned and operated by a metropolitan government fell and injured himself at the center. The trial court found that the metropolitan government breached its duties and was at fault for the patron's injuries, but that the patron was also at fault in failing to notice the drainage cut that caused his fall. The trial court apportioned eighty percent of the fault to the metropolitan government and twenty percent to the patron. The metropolitan government appeals, arguing that the patron was at least fifty percent at fault. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

James Earl Robinson, Patrick John Bradley, and Phylinda Lorene Ramsey, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville & Davidson County.

James Bryan Moseley, Murfreesboro, Tennessee, for the appellees, Ronald Osborne and Tonie Osborne.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Metropolitan Government of Nashville and Davidson County ("Metro") owns and operates the East Nashville Convenience Center, a facility designed to provide citizens of Davidson County with a place to take trash that is too large for pickup by the regular trash trucks--for example, appliances and furniture.

The convenience center had eight-foot-tall bins for the disposal of trash items. There were two levels for access to the bins, a lower level and an upper platform that was five feet, three inches higher than the lower level. The bins sat on the lower level. A person could drive onto the upper platform and then stand on the platform and put items in the bins from there. In order to prevent vehicles from driving off of the upper platform, there was a 26-inch-wide concrete barrier around its edge that extended three or four inches beyond the top of the platform. During a 2007 renovation, 15-inch-long drainage cuts were placed in the concrete barrier to allow water to drain off of the platform onto the lower level. There were signs that instructed patrons: "Please Use Care When You Unload Items" and "Children Must Stay Inside of Your Vehicle."

Ronald Osborne visited the convenience center on February 28, 2014, to dispose of some building materials. When Mr. Osborne arrived at the convenience center, a worker directed him to a certain bin. Mr. Osborne had been to the convenience center many times, but he had never used that particular bin, nor had he ever been in the area where the concrete barrier had drainage cuts. To get to the bin, Mr. Osborne drove his truck up a ramp to the elevated platform and backed up close to the concrete barrier on the driver's side of his truck, with the bed of the truck over the concrete barrier near the trash bin he was using.

Mr. Osborne stepped out of his truck onto the concrete barrier. He took no precautions, such as looking down at the barrier after he stepped onto it or holding onto his truck. Facing the truck, Mr. Osborne sidestepped along the barrier, moving from the cab of his truck toward the back of his truck, throwing items into the bin to the rear of the truck. When he approached the back of the truck, the area where the drainage cut was located, Mr. Osborne turned to face the bin. His left foot "hit air" and he fell approximately five feet, sustaining injuries to his left arm.

Mr. Osborne and his wife, Tonie Osborne, filed suit on January 22, 2015, against Metro under the Governmental Tort Liability Act for the negligent acts of Metro employees as well as the maintenance of an unsafe condition on Metro property. The complaint includes the following allegations:

> 5.6 The raised walkway is used by individuals to throw garbage from their vehicles into the bins.
> 5.7 The walkway adjacent to the bin to which Mr. Osborne had been directed by the Defendant's employee had an unprotected hole or gap in the walkway.
> 5.8 As Mr. Osborne used the raised walkway to throw garbage into the bin, his foot fell into the gap causing him to fall off the platform onto the ground beside the bin.
> . . . .

5.12 It is foreseeable that a gap in a walkway can be hazardous to a person using the walkway.

5.13 The gap is very low to the ground making it difficult for pedestrians to notice.

5.14 The gap is not marked and the surrounding material is all the same appearance and color making it difficult for pedestrians to notice.

5.15 It is foreseeable that a person using the walkway would be focused on the garbage being thrown away, the bin into which the garbage is being thrown, and the drop off itself, and that these distractions would draw the pedestrian's attention away from the gap.

5.16 A low gap in a walkway which is unmarked, uncovered, and unprotected is an unsafe and dangerous condition.

5.17 Defendant [Metro] through its agents and/or employees, failed to warn Mr. Osborne of the gap in the walkway.

. . . .

5.24 The walkway where Mr. Osborne was injured was not in compliance with recognized walkway safety standards.

5.25 The walkway where Mr. Osborne was injured was unsafe and unreasonably dangerous.

Mr. Osborne asserted the following specific causes of action against Metro: (1) negligence for breach of its duties to maintain the property in a reasonably safe condition, to inspect the property to discover unsafe conditions, to remove or repair unsafe conditions whenever possible, and to give proper warning of conditions that could not be removed or repaired; and (2) negligence for failure to comply with safety standards and local codes. The complaint also includes a claim for loss of consortium on behalf of Ms. Osborne. In its answer, Metro disagreed with many of Mr. Osborne's factual assertions and denied any liability. Moreover, Metro asserted affirmative defenses, including comparative fault.

The case was tried without a jury on March 21 and 22, 2017. The plaintiffs presented testimony from David Johnson, an expert witness in safety engineering and safety standards and in policies and procedures for the inspection of walkways. The plaintiffs' other witnesses were Mr. Osborne; Bart Osborne, his son; and Mrs. Osborne. The plaintiffs' also submitted the deposition testimony of Dr. Christian Anderson, the surgeon who treated Mr. Osborne for his injuries. Metro's witnesses were Clayton Hand, Metro solid waste engineer; Vivian Hubble, Metro safety inspector; Cody Osborne, a waste superintendent for Metro Public Works; and Mr. Osborne. We will summarize the testimony of these witnesses below as relevant to the issues on appeal.

*Trial court's ruling*

In a final judgment entered on April 25, 2017, the trial court entered judgment in favor of Mr. Osborne and apportioned fault eighty percent to Metro and twenty percent to Mr. Osborne. The trial court made the following pertinent findings of fact and conclusions of law:

3. While at the convenience center on this date, Mr. Osborne stepped into an unprotected and unmarked hole. He ultimately fell approximately five feet resulting in a serious fracture to his left arm which required surgery.
. . . .
8. The Court specifically finds that the concrete barrier was a structure as that term is used in Tenn. Code Ann. § 29-20-204.
9. Although the barrier is mostly continuous around the edge of the raised platform, at certain locations there is a cut out portion of the barrier for drainage purposes.
10. Given the location of the barrier, its relatively low height, and over two-foot width, the Court finds that it was reasonably foreseeable to expect that persons would step onto the barrier as well as walk on the barrier.
11. Persons at the convenience center, including Mr. Osborne, had, in fact, used the barrier as a walkway prior to this incident on February 28, 2014.
. . . .
14. Plaintiffs' expert, David Johnson, is a safety engineer and certified safety professional who is a member of the walkway safety sub-committee of the American Society for Testing and Materials. His testimony concerning the condition of the drainage cut and how individuals would interact with and perceive the drainage cut was very persuasive.
15. Mr. Johnson gave expert testimony concerning the fact that the concrete barrier was a foreseeable walkway.
16. Mr. Johnson indicated that, as a walkway, the presence of the drainage cut was the equivalent of a hole or floor opening.
17. Mr. Johnson also indicated that such holes in walkways are known trip and fall hazards as people could easily fail to notice the hole and step or trip in the hole and fall.
18. Mr. Johnson indicated that reasonable precautions can be taken to protect people from the hazard presented by the drainage cut including placing a cover over the hole, placing a rail around the hole to act as a guard, and provide high contrast markings and warnings to draw a person's attention to the hole.
19. Based upon the testimony of the witnesses and the exhibits admitted into evidence, the Court finds that the drainage cut was a dangerous condition.

20. Therefore, Defendant Metro's immunity is removed pursuant to Tenn. Code Ann. § 29-20-204 because it owned and controlled a structure which was in a dangerous condition and had actual knowledge of the condition.

21. Defendant Metro had not taken any precautions to protect individuals at the convenience center from the dangerous condition of the drainage cut.

22. Defendant Metro had no warning signs specific to the drainage cut, no cover over the drainage cut, no railing or guard around the drainage cut, and no markings to alert users of the presence of the drainage cut.

23. Defendant Metro also did not have a set policy, procedure, or training for employees to give any type of verbal warning to persons at the convenience center concerning the danger of the drainage cut or instructions not to use the concrete barrier as a walkway.

24. The Court found that Mr. Osborne's testimony was credible, as was the testimony of Mrs. Osborne and Mr. Osborne's son, Bart Osborne.

25. The Court finds that Mr. Osborne was not personally aware of the presence of the drainage cut prior to this incident because, although he had been to the convenience center previously and used other parts of the concrete barrier, he had never seen or encountered the drainage cut prior to his fall.

26. The presence of the drainage cut was not open and obvious.

27. The Court finds that Defendant Metro had a duty to use reasonable care to maintain its property in a reasonably safe condition, to remove dangerous conditions which could be removed, or to warn or guard others of dangerous conditions which could not, as a practical matter, be removed or repaired.

28. Defendant Metro breached these duties by allowing a dangerous condition to exist on its property without taking steps to remove or repair the condition or provide any type of warning of its presence.

29. The breaches by Defendant Metro were the proximate and legal cause of Mr. Osborne's injuries.

. . . .

31. The Court further finds that maintaining the East Nashville Convenience Center in a safe condition was an operational function and not discretionary. Therefore, Defendant Metro's immunity is also removed pursuant to Tenn. Code Ann. § 29-20-205.

32. Although Mr. Osborne was not aware of the drainage cut prior to his fall, the Court finds that he was aware of the need to be careful in using the concrete barrier to throw away trash.

33. The Court finds that Mr. Osborne's failure to notice the drainage cut, however, was not the overriding cause of his injuries.

The trial court entered judgment in favor of the Osbornes in the amount of $168,000.00, which represents "the gross award of $210,000.00 reduced by the 20% comparative fault of Mr. Osborne."[1] Metro appeals.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Church v. Church*, 346 S.W.3d 474, 481 (Tenn. Ct. App. 2010). Evidence does not preponderate against a trial court's finding of fact unless it "support[s] another finding of fact with greater convincing effect." *Milledgeville United Methodist Church v. Melton*, 388 S.W.3d 280, 285 (Tenn. Ct. App. 2012). Because a trial court is in a better position to observe a witness's demeanor as he or she testifies, a trial court is "accorded significant deference in resolving factual disputes when the credibility of the witnesses is of paramount importance." *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006) (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). A trial court's conclusion of law enjoys no presumption of correctness, however, and we review all issues of law de novo. *ABN AMRO Mortg. Grp., Inc. v. S. Sec. Fed. Credit Union*, 372 S.W.3d 121, 126 (Tenn. Ct. App. 2011); *Estate of Darnell v. Fenn*, 303 S.W.3d 269, 275 (Tenn. Ct. App. 2009).

ANALYSIS

The only issue on appeal is whether the trial court erred in finding Mr. Osborne only twenty percent at fault. Metro asserts that the weight of the evidence establishes that he was at least fifty percent at fault. In the alternative, Metro argues that Mr. Osborne was more than twenty percent at fault.

The plaintiffs brought this case under the Tennessee Governmental Tort Liability Act ("the GTLA"), Tenn. Code Ann. §§ 29-20-101–29-20-408, which allows local governmental entities to be sued in tort in enumerated circumstances. With respect to premises liability cases, this court has stated:

> [The GTLA] basically codifies the common law obligations of owners and occupiers of property embodied in premises liability law, which generally requires the exercise of ordinary care and diligence in maintaining the premises, including an affirmative duty to protect against dangers of which one knows or which, with reasonable care, might discover.

---

[1] Out of the gross award, $10,000 was for Mrs. Osborne. The trial court found that she was "inconvenienced and had to take care of Mr. Osborne during his period of recuperation, including having to care for his personal needs."

*Lindgren v. City of Johnson City*, 88 S.W.3d 581, 584 (Tenn. Ct. App. 2002); *see also* Tenn. Code Ann. § 29-20-204.

If a court finds the premises owner negligent (as the trial court found Metro negligent in this case), it must then determine whether the plaintiff was also negligent. *McIntyre v. Balentine*, 833 S.W.2d 52, 57-60 (Tenn. 1992). Under Tennessee's system of comparative fault, if both parties were negligent and their negligence was a proximate cause of the plaintiff's injuries, the court "must determine the degree of such negligence, expressed as a percentage, attributable to each party." *Id.* at 59. If the percentage of negligence attributable to the plaintiff is less than the percentage of negligence attributable to the defendant, the plaintiff may recover the portion of damages not caused by the plaintiff's own negligence. *Id.* Thus, in order to recover, the plaintiff must be less than fifty percent at fault. *Id.* at 57, 59.

The apportionment of fault is a question of fact subject to the same standard of review as any other question of fact under Tenn. R. App. P. 13(d), namely a presumption of correctness unless the evidence preponderates to the contrary. *Cross v. City of Memphis*, 20 S.W.3d 642, 644-45 (Tenn. 2000); *King v. Anderson Cnty.*, No. E2012-00386-COA-R3-CV, 2012 WL 5960838, at *3 (Tenn. Ct. App. Nov. 29, 2012); *Curry v. City of Hohenwald*, 223 S.W.3d 289, 291-92 (Tenn. Ct. App. 2007). In *Eaton v. McLain*, 891 S.W.2d 587, 593 (Tenn. 1994), our Supreme Court stated that "the fault apportionment question is ultimately dependent upon all the circumstances of the case." The Court listed six factors that a court should consider in apportioning fault:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Eaton*, 891 S.W.2d at 592 (footnotes omitted). The fourth factor, regarding sudden emergency, does not apply in this case.

Drawing upon these factors, Metro makes four distinct arguments as to why Mr. Osborne "was at least 50 percent at fault for his fall." Their first argument is that the accident occurred at a location, the convenience center, where Mr. Osborne should have exercised heightened care for his own safety, and he failed to do so. As Metro points out, people go to the convenience center to dispose of heavy appliances and other materials,

and Mr. Osborne was there to dispose of building materials and lumber. Warning signs advised visitors to use caution in unloading their vehicles and prohibited children from leaving the vehicles or being on convenience center grounds. Furthermore, Metro argues, the specific location used by Mr. Osborne should have led him to exercise additional precautions. He drove his truck onto a raised platform over five feet above the lower level and he chose to stand on a 26-inch-wide barrier with an unprotected drop to the lower level.

Mr. Osborne asserts that he had been to the convenience center as many as fifty times in twelve years and had never been directed to the area where the drainage cuts were located. There were no signs or markings cautioning customers about the presence of the drainage cuts, and Mr. Osborne testified that he was never told about the drainage cuts. In addition, there were no signs, instructions, or warnings against using the concrete ledges as walkways. The plaintiffs concede that the drainage cut was visible, "giving support for the Trial Court's finding of 20% fault," but they deny that there is any evidence that the drainage cut was noticeable.

Metro relies upon the case of *Bradford v. City of Clarksville*, 885 S.W.2d 78 (Tenn. Ct. App. 1994), to support its argument. The *Bradford* case involved the liability of the City of Clarksville for injuries sustained by a pedestrian, Ms. Bradford, who tripped over a defective gas and water meter cover. *Bradford*, 885 S.W.2d at 79. The trial court determined that Ms. Bradford was twenty percent at fault, and Ms. Bradford appealed this issue. *Id.* at 79-80, 83. The appellate court concluded that the evidence preponderated against the trial court's finding that Ms. Bradford was negligent and set forth the following principles:

> The general rule is that "a citizen walking along a street does not have to keep his eyes on the pavement all the time; he may presume the city has done its duty. *It is not negligence to fail to look for danger which under the surrounding circumstances he had no reason to apprehend." Morrow v. Town of Madisonville*, 737 S.W.2d 547, 549 (Tenn. App. 1987) (quoting *Batts v. City of Nashville*, 22 Tenn. App. 418, 123 S.W.2d 1099 (1938)).

*Id.* at 83 (emphasis added). Thus, *Bradford* counsels that a person's degree of negligence, if any, depends upon all of the surrounding circumstances.

Mr. Osborne points out that the sixth *Eaton* factor also comes into play here. Metro owned and controlled the convenience center and oversaw the construction of the drainage cuts. Mr. Osborne was a patron of the center without knowledge of the drainage cut. He contends that Metro was in the best position to remedy the danger created by the drainage cuts. *See McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980) ("This duty of the owner or occupier of the land [to exercise ordinary care and diligence to maintain the premises in a safe condition for invitees] arises from the position of control which this

person in possession occupies; he is the person normally best able to prevent any harm to others.”).

Metro’s second argument in favor of increased fault for Mr. Osborne is that he was inattentive and failed to take precautions as he walked along the barrier. In addition to what has been said above, Metro asserts that Mr. Osborne’s actions were unreasonable because he decided to stand on the concrete barrier although it was not necessary for him to do so. Then, he walked on the barrier with a sidestepping action, made a half turn, and took a step, all without looking at the concrete barrier after stepping onto it. Mr. Osborne never held onto the truck, although his back was facing a five-foot drop. Taken together, Metro argues, Mr. Osborne’s actions in confronting the risk were unreasonable and establish that he was at least fifty percent at fault.

The main case upon which Metro relies for its second argument is *Herbison v. Hansen Chrysler-Plymouth, Inc.*, No. 01A01-9710-CV-00594, 1998 WL 485668, at *1 (Tenn. Ct. App. Aug. 19, 1998), a case in which the plaintiff entered an auto repair shop and tripped over a metal strip in the doorway that protruded slightly above the level of the concrete floor. Concluding that “the sole cause of the injury was the culpable inattention of the injured party,” the appellate court affirmed the trial court’s dismissal of the lawsuit. *Herbison*, 1998 WL 485668, at *3. The evidence in *Herbison* included the following:

> [T]hat [the plaintiff] visited defendant[’s] premises three or four times a year to purchase repair parts, that he almost always entered the shop of the defendant through the doorways used for moving vehicles into the shop, that, on July 24, 1995, he parked in the parking lot and walked to the doorway he ordinarily used, that he tripped on a yellow metal ridge in the floor of the doorway, that if he had been looking at his path he would have seen the yellow metal ridge, but he was looking ahead for the parts department which had been moved to a different part of the shop. He admitted that there were signs at the scene which read “Do not use vehicle doors to enter bay, walk in Service Entrance” with arrow pointing to another door, and “Service Entrance” beside the other door, but that he thought the signs referred to service customers and not parts customers.

*Id.* at *1. Thus, in *Herbison*, unlike in the present case, there were signs alerting the plaintiff not to use the doorway and the dangerous strip was colored yellow.

The other cases cited by Metro are likewise distinguishable. *See Elrod v. Cont’l Apartments*, No. M2007-01117-COA-R3-CV, 2008 WL 425947, at *1 (Tenn. Ct. App. Feb. 13, 2008) (finding plaintiff’s fault to be greater than defendant’s where Ms. Elrod used caution when walking toward deposit box but, despite being aware of snow and ice, “elected to walk in a ‘trot like’ manner” back to her car, resulting in her injuries); *Berry v. Houchens Mkt. of Tenn., Inc.*, 253 S.W.3d 141, 148 (Tenn. Ct. App. 2007) (finding

plaintiff at least fifty percent at fault where she fell in a puddle of oil in a parking lot, a puddle that the plaintiff described as "clearly distinguishable from the surface of the lot"); *Easley v. Baker*, No. M2003-02752-COA-R3-CV, 2005 WL 697525, at *8 (Mar. 24, 2005) (finding plaintiff at least fifty percent at fault for injuries sustained from fall on wet floor in restaurant bathroom where plaintiff failed to see accumulated water and "wet floor" signs and to be aware of the fact that he had taken at least two steps into the water before he slipped); *see also Holland v. K-VA-T Food Stores, Inc.*, No. E2013-02798-COA-R3-CV, 2015 WL 151373, at *3 (Tenn. Ct. App. Jan. 13, 2015) (finding no duty on the part of the defendant for injuries sustained when the plaintiff tripped over a curb in the defendant's parking lot because "Plaintiff's mode of travel, namely walking backward, was the cause of her injury," the court declined to address comparative fault); *Green v. Roberts*, 398 S.W.3d 172, 181 (Tenn. Ct. App. 2012) (finding no duty on the part of the defendant with respect to a defect in a commercial parking lot that was visible from up to eighty feet away).

In contrast to *Herbison* and the other cases cited by Metro, the trial court in this case found that the "presence of the drainage cut was not open and obvious" and that "Mr. Osborne's failure to notice the drainage cut . . . was not the overriding cause of his injuries." The court found that Metro failed to take reasonable precautions to protect people from the hazard created by the drainage cuts, such as placing a cover or guard over the drainage cuts, painting the drainage cuts with yellow safety paint to make the holes more noticeable to patrons, or warning patrons about the presence of the drainage cuts.

Metro's third argument is that, focusing upon the first *Eaton* factor, there is doubt as to the actual cause of Mr. Osborne's fall. Metro's reasoning here is as follows:

> [I]t is illogical that with his truck to his left and the five foot drop off to his right that Mr. Osborne would have stepped forward with his left foot across his planted right foot, and then immediately fell to the lower level to his right. Based on Mr. Osborne's account of his fall, his left foot should have landed on the surface of the upper platform in the drainage cut. But Mr. Osborne insists that his foot did not touch anything. This contradiction in his account at least suggests that some other factor other than the drainage cut itself led to his fall. This testimony casts doubt on whether the drainage cut was the sole cause of Mr. Osborne's fall.

Mr. Osborne consistently stated that he fell when he stepped into the drainage cut. He made figurative statements such as, "My left foot just hit air" and that he felt as if he were "free falling from 30,000 feet." The trial court was in the best position to observe Mr. Osborne's manner and demeanor and to assess his credibility as a witness, and we will not overturn the trial court's assessment absent clear and convincing evidence to the contrary. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999); *Union*

*Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court found Mr. Osborne's testimony, as well as the testimony of his wife and son, credible.

Metro's fourth, and final, argument concerning the reasonableness of Mr. Osborne's actions is that Mr. Osborne's conduct was more unreasonable than that of the plaintiff in *Huskey v. Rhea County*, No. E2012-02411-COA-R3-CV, 2013 WL 4807038 (Tenn. Ct. App. Sept. 10, 2013), a case in which the plaintiff was found to be forty-nine percent at fault. The facts in *Huskey* are similar to those in the present case. Ms. Huskey drove her truck to a county convenience center to dispose of some items from her attic. *Huskey*, 2013 WL 4807038, at *1. She had been to the center on a weekly basis to dispose of household refuse. *Id.* When she arrived at the center, Ms. Huskey was directed to a large dumpster used for items that would not fit into the compactor. *Id.*

> The dumpster, which was approximately eight feet tall, rested on a concrete slab. The slab sat approximately three feet below the level of the gravel lot. As [the attendant] testified, the purpose of this placement was for patrons to back their vehicles toward the dumpster on the gravel lot and place refuse into the top opening of the dumpster, which container had no side openings. This process required patrons to either throw their refuse in the opening approximately five feet above where they were standing on the gravel lot or place the items in the opening from an elevated position by standing on their truck beds. The dumpster was flanked by the Center's fencing on two sides, the gravel lot on one side, and a concrete slab on the remaining side. The concrete slab was not designed for patrons to access the dumpster.

*Id.* There was a cinder-block wall extending up from the concrete slab, and the wall separated the dumpster from the gravel parking lot. *Id.* The wall was about one foot above the gravel lot along the center of the dumpster. *Id.* With this additional height, a patron could step on the wall and more easily reach the top of the dumpster. *Id.* The height of the wall decreased gradually on the right side "in a stair-step fashion as the gravel lot sloped down gradually to the level of the dumpster." *Id.* There were no signs or warnings in the dumpster area. *Id.* On the day of Ms. Huskey's accident, the dumpster was almost full, with some room remaining along the sides. *Id.* at *2. Her fall occurred as follows:

> Ms. Huskey lifted an empty Styrofoam cooler out of her truck, stepped onto the wall, and threw the cooler onto the dumpster. Continuing to hold the dumpster with one hand, she used her other hand to mash the cooler down into the dumpster. She then turned on her right foot while attempting to place her left foot at the point where the cinder-block wall height was lower. Losing her balance, she fell approximately four feet onto the concrete slab.

*Id.* The trial court found both parties negligent and allocated fifty-one percent of the fault to the County and forty-nine percent to Ms. Huskey. *Id.* at *3.

On appeal, the County argued that the trial court should have found Ms. Huskey at least fifty percent at fault, thus barring her recovery. *Id.* at 10. The trial court found her negligent for her "failure to observe," which the appellate court presumed to be a reference to her failure to observe the "'somewhat obvious' danger of using the uneven wall for elevation and how her feet were placed on it." *Id.* Ms. Huskey pointed out that the attendant directed her to the right side of the dumpster and never warned her to stay off of the wall. *Id.* The County emphasized that Ms. Huskey was familiar with the center and chose to visit near closing time when the dumpster was near capacity. *Id.* Applying the *Eaton* factors, the appellate court stated that the fact that the danger was "somewhat obvious" could "implicate both the defendant and the plaintiff." *Id.* at *11. The court went on:

> As we have determined above, the County owed an affirmative duty to eliminate or warn of the dangerous condition. Because it also should have been somewhat obvious to Ms. Huskey that standing on the uneven wall to reach the dumpster could cause her to fall, the trial court properly found her negligent in confronting the risk.
>
> Even where the danger may be considered obvious, however, Ms. Huskey's decision to use the wall does not negate the County's duty to protect her from the danger. As our Supreme Court has held:
>
>> That a danger to the plaintiff was "open or obvious" does not, *ipso facto*, relieve a defendant of a duty of care. Instead, the duty issue must be analyzed with regard to foreseeability and gravity of harm, and the feasibility and availability of alternative conduct that would have prevented the harm.
>
> *Coln [v. City of Savannah]*, 966 S.W.2d [34,] at 43 [Tenn. 1998].

*Id.* The appellate court concluded that the evidence did not preponderate against the trial court's allocation of fault. *Id.* at *12.

Metro argues that Mr. Osborne was more at fault than Ms. Huskey because Ms. Huskey was required to place her refuse on the right side of the dumpster, where the wall descended, because the dumpster was almost full. Thus, unlike in the present case, Metro argues, Ms. Huskey acted out of necessity. In addition, Metro argues, Ms. Huskey took the precaution of holding onto the dumpster with one hand, whereas Mr. Osborne took no precautions as he walked along the concrete barrier, without even looking down. Metro

- 12 -

further asserts that Ms. Huskey acted more reasonably than Mr. Osborne in that she saw and was aware of the slope of the wall, whereas Mr. Osborne failed to see and was not aware of the drainage cuts in the concrete barrier.

However, as Mr. Osborne points out, the cases differ significantly in that Ms. Huskey knowingly stepped on uneven cinder blocks, while Mr. Osborne had no reason to know of the presence of the drainage cut before he stepped onto the concrete barrier. His prior experience with the convenience center led him to believe that the concrete barrier had no holes. Moreover, there is no mention in the *Huskey* case of expert testimony, whereas in this case an expert testified that the concrete barrier was a foreseeable walkway. As in the *Curry* case, discussed above, Metro had a duty to repair or remove the unsafe condition on its property. *See Curry*, 223 S.W.3d at 294-95.

The trial court heard the witnesses and entered detailed findings of fact and conclusions of law indicating analysis of the relevant factors. After considering all of Metro's arguments and the relevant *Eaton* factors, we conclude that the evidence does not preponderate against the trial court's allocation of twenty percent of the fault to Mr. Osborne and eighty percent to Metro.

CONCLUSION

The judgment of the trial court is affirmed with costs of appeal assessed against the appellant, the Metropolitan Government of Nashville and Davidson County.

_____
ANDY D. BENNETT, JUDGE