## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

| | | |
|---|---|---|
| **SUZANNE KAY BURLEW,** | ) | |
| | ) | |
| Plaintiff/Counterdefendant/ | ) | Shelby Chancery No. D26813-II |
| Appellant, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | Appeal No. 02A01-9807-CH-00186 |
| **BRAD STEVEN BURLEW,** | ) | |
| | ) | |
| Defendant/Counterplaintiff/ | ) | |
| Appellee, | ) | |

**FILED**

**July 23, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

## APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
## AT MEMPHIS, TENNESSEE

### THE HONORABLE FLOYD PEETE, JR., CHANCELLOR

For the Plaintiff/Counterdefendant/
Appellant/Counterappellee

Stevan L. Black
Vickie Hardy Jones
Memphis, Tennessee

For the Defendant/Counterplaintiff/
Appellee, Counterappellant:

William W. Dunlap, Jr.
Memphis, Tennessee

**AFFIRMED IN PART, REVERSED IN PART, MODIFIED AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is a divorce case with issues regarding custody and alimony. The trial court awarded the parties joint custody of their minor child, with the wife as primary custodial parent except during designated time periods. The trial court awarded the wife alimony *in solido*, but no alimony *in futuro*. The wife appeals the trial court's rulings regarding child custody and visitation, as well as alimony. Husband appeals the trial court's order regarding alimony. We affirm in part, reverse in part, modify and remand.

Plaintiff/Counterdefendant/Appellant Suzanne Kay Burlew ("Wife") and Defendant/Counterplaintiff/Appellee Brad Steven Burlew ("Husband") were married in Flint, Michigan in August 1972. There is one minor child of the marriage, Geoffrey Burlew ("Geoff"), born April 5, 1990. At the time of trial, Wife was forty-five years old, and Husband was forty-seven years old.

When the parties married, Husband was attending General Motors Institute and was in the process of obtaining a degree in engineering. After completing the program, Husband worked for one year as an engineer for General Motors. Meanwhile, Wife was studying to obtain a nursing degree. In 1974, Wife graduated from University of Michigan with a degree in nursing and later became employed full-time as a registered nurse. In 1974, Husband enrolled in the University of Michigan to complete prerequisites for medical school and worked on a part-time basis. In 1975, when Husband enrolled in medical school at Northwestern University, Husband and Wife relocated to Chicago, and she began new employment

In 1979, the parties moved to Detroit where Husband accepted and completed an internship, several years of residency and fellowships in cardiology. From 1979 to 1986, Wife worked full-time as a nurse. Wife also obtained a master's degree in nursing, attending classes on a part-time basis and utilizing a tuition reimbursement plan provided by her employer. Wife's income was utilized for living expenses as well as Husband's medical school expenses.

In 1980, the parties began experiencing marital problems. Husband told Wife that he had had an extramarital affair. Husband promised Wife that he would not have another affair, and the parties recommitted to their marriage.

In 1986, the parties moved to Memphis, Tennessee where Husband accepted a teaching position with the University of Tennessee and also joined a private medical practice with the University of Tennessee Medical Group ("UT Medical Group"). At this time, Wife began attending

law school at the University of Memphis. In 1989, Wife completed law school and passed the Tennessee bar examination. After several miscarriages and several years of attempting to conceive a child, Wife became pregnant with a high risk pregnancy in July 1989, immediately after completing law school and the bar examination. The pregnancy resulted in the birth of the parties' minor child, Geoff. Thereafter, by agreement of the parties, Wife remained at home to raise Geoff.

In 1993, Husband had a second affair, and there was a second agreement between the parties to remain in the marriage. Then, in 1995, Wife learned that Husband was spending time with another woman. Husband denies having a sexual relationship with the woman. In 1996, Wife filed for divorce, alleging irreconcilable differences and inappropriate marital conduct. Husband counterclaimed on the same grounds.

Prior to trial, the parties reached an agreement regarding division of the marital property. Wife received 60.7% of marital assets while Husband received 39.3% of the assets. Both parties sought custody of Geoff. Upon Wife's motion, the trial court appointed a guardian ad litem, Kelly Stark, to represent Geoff's interests.[1]

At the time of trial, Husband was a tenured associate professor of medicine at the University of Tennessee. In his work with UT Medical Group, Husband performs heart catheterizations for patients. Husband is also a self-employed consultant in medical malpractice cases. He receives income from all three sources. In 1997, Husband earned approximately $93,000 as an associate professor, approximately $101,300 from UT Medical Group, and approximately $9,000 as a consultant, for an approximate gross income of $203,300. Wife, at the time of trial, was studying to obtain a Master's degree in business administration. She testified that she decided to pursue this degree when she realized that her skills were dated after staying home with Geoff. Wife worked in two part-time nursing positions for several months at each position, only to maintain her nursing license. At the time of trial, Wife had no source of income other than the monies received from Husband.

At trial, it was undisputed that Wife was Geoff's primary caregiver since his birth and during the course of the marriage. Wife testified that Geoff suffers from asthma and is under the care of an allergist who prescribes preventive medication to control his symptoms. Wife was responsible for

---

[1]The guardian ad litem issued a report prior to trial which was not admitted into evidence and not considered by the trial court. Consequently, the report is not considered in this appeal.

transporting Geoff to doctor's appointments. In addition to tending to Geoff's health care needs, Wife was responsible for the child's educational needs and attended the majority of school functions. Wife transported Geoff to extracurricular activities including swimming, skating, and tennis lessons. Witnesses presented by Wife testified that she and Geoff have a good and loving relationship.

The proof at trial indicated that prior to the parties' separation, Husband was far less involved than Wife in Geoff's upbringing, rarely attending school events, taking him to appointments with physicians or assisting in school work. When the parties separated, Husband sought to become more involved with Geoff. During Husband's scheduled visitation, he took Geoff to school, helped him with schoolwork, cooked for him and taught him to play the cello. The parties agreed that Geoff benefitted from Husband's increased involvement with Geoff.

In his testimony, Husband explained that he has two "call" schedules. Husband is on call for the department of cardiology approximately every fifth week. This call schedule results in Husband being on call from approximately 5:00 p.m. on Friday until 7:00 a.m. the following Friday. During that week, Husband is required to respond to calls on weekends and evenings regarding patients treated by physicians at the department, and must make rounds at the hospital on Saturday and Sunday mornings of the fifth weekend to see patients of the department. Except for his rounds at the hospital, Husband testified that virtually all other calls can be "managed over the telephone." Husband's second call schedule requires him to be on call twenty four hours a day, seven days a week to perform cardiac catheterizations. Husband testified that this occurs "with random frequency" and that only once during the two years in which the parties were separated had Husband been called to do such an emergency procedure while Geoff was in his care. On that occasion, Husband brought Geoff to Wife's home.

Husband presented the testimony of Dr. Judith Soberman ("Dr. Soberman"), another cardiologist employed by the University of Tennessee and UT Medical Group. Dr. Soberman testified that she and other physicians take their children to the hospital while they conduct rounds. Dr. Soberman described bringing her two children, ages eight and four, to the hospital while she saw patients in the intensive care unit, and putting the children alone in the nurses' lounge with books and asking the eight-year old to "watch your brother." Dr. Soberman testified that her call schedule does not conflict with her obligation to her children. She testified that, in the academic training system in which she and Husband work, most of the emergencies can be handled over the telephone.

3

Dr. Soberman conceded that she is married, that she does not perform cardiac catheterizations, and that her specialty, cardiac arrhythmia, does not require her presence at the hospital for emergencies.

The parties also testified about their disagreement regarding Geoff's asthma. Prior to the separation, Wife located an allergist; she testified that Husband did not participate in locating an allergist because he did not believe that Geoff's asthma was serious. Husband testified that he did not consider Geoff's condition to be serious because Geoff participates in sports and has never been hospitalized due to the asthma.

The guardian ad litem, attorney Kelly Stark, testified that she found both parents to be good and loving parents and found Geoff to be a bright, poised child. She stated that Geoff would not express a preference for either parent. She noted that, since the parties' separation, Husband had become a "dedicated dad" and that Husband's increased involvement in Geoff's upbringing had resulted in a "special relationship" between them. Stark testified that Wife was angry at her for meeting with Geoff without first informing Wife and that Wife did not want Stark to obtain any information from psychologists who had treated Wife. Stark expressed concern that Mother would move to Michigan where her extended family lives and believed that if Husband were awarded custody there was a good chance Wife would stay in Tennessee. Stark also felt that Wife was not genuinely supportive of Husband's relationship with Geoff.

On the financial issues, each party filed an Affidavit of Income and Expenses. Husband's affidavit shows a gross monthly income of $14,500.92 as an associate professor from the University of Tennessee and a net monthly income of $9,797.99. In addition, Husband receives $33,308.12 from bonuses and other sources of income. Husband lists $9,723 in monthly expenses, including $5,000 per month in pendente lite support. Wife's affidavit indicated that Wife has no source of income and lists $4,713 in monthly expenses, excluding Geoff's expenses.

Both parties presented expert testimony. Robert Winfield, a certified financial planner, testified for Wife that, considering Husband's income from the University of Tennessee, the UT Medical Group and his consulting, Husband would be able to pay Wife $3,500 per month in alimony and $2,100 per month in child support. Based on information from Wife, Winfield assumed that Wife's earning capacity was approximately $30,000 per year and that she would work part-time until Geoff reached the age of twelve. He testified that the amount of alimony and child support requested, plus $1,000 per month in rehabilitative alimony, would be necessary in order to prevent

4

Wife from depleting assets received in the division of marital property. Husband did not object to Winfield's testimony.

Husband presented the testimony of William H. Watkins, a certified public accountant. Watkins testified that, if Wife earned $30,000 per year, with child support, her net annual income would not require her to encroach upon her share of the marital assets. Watkins also testified regarding the range of compensation Wife could earn in the health care field and as a lawyer. Watkins' testimony on the compensation Wife could earn in these fields was based on his having clients in the health care and the legal profession, telephone calls to entities hiring entry-level employees in these fields, and information from the newspaper, and surveys conducted by several local hospitals. Wife's counsel objected to Watkins's testimony on the compensation Wife could expect to earn, based on Watkins' lack of expertise in this area as well as hearsay. The trial court admitted Watkins' testimony into evidence.

Wife testified that she had sent her resume to over forty-seven prospective employers in both the nursing and legal fields. As a result, Wife interviewed for several nursing positions and at least one position in the legal field. Wife testified that she had "not really" been offered a job. Wife also testified that she interviewed with one law firm who wished to offer her a position, but they were handling a case in which Husband was involved and declined to offer her the job. Wife testified that once she found a job she anticipated earning approximately $30,000 per year. Husband testified that Wife could earn $35,000 to $40,000 "and depending on the degree of effort up to $65,000 or thereabouts" employed as a staff nurse. Husband admitted on cross-examination that Wife could not make $65,000 working eight hours a day from 8:00 a.m. to 5:00 p.m.

Wife acknowledged having taken over $61,000 in joint marital funds. Most of these monies were paid to Wife's several attorneys, to the University of Memphis for Wife's M.B.A. program, and for Geoff's private school tuition.

At the conclusion of the trial, the trial court awarded a divorce to Wife on the grounds of inappropriate marital conduct. On the issue of custody and visitation, the trial court held:

> 3. Plaintiff and Defendant are awarded joint custody of the parties' minor child. Plaintiff shall be the primary custodial parent, with the exception of the period of time during the child's summer vacation and the Christmas holidays when Defendant is exercising visitation as hereinafter provided. For that portion of the child's summer vacation and the Christmas holidays when Defendant is exercising visitation, Defendant shall be the primary custodial parent. Also, for that portion of the child's

summer vacation when Defendant is exercising visitation, Plaintiff shall enjoy the visitation regularly enjoyed by Defendant.

Plaintiff and Defendant are to confer on all major decisions concerning the child.

Each of the parties may have the right to have the minor child with them for one-half (½) of the child's summer vacation. During the summer, each parent may have visitation with the child for a period of at least two (2) weeks uninterrupted by the visitation schedule . . . .

Defendant shall have visitation with the minor child every other week, beginning on Wednesday after school and ending on Monday when Defendant takes the child to school. On alternate weeks, Defendant shall also have visitation with the minor child Wednesday after school until Thursday morning when Defendant takes child to school . . . .

Husband was ordered to pay $2,100 per month in child support, as well as the child's education expenses of $7,032 per year. In addition, the trial court set out a holiday visitation schedule. After ordering Husband to maintain medical and dental insurance on behalf of Geoff, the trial court held that both parties had the right "after conferring" to take Geoff to see doctors, dentists and other health care providers. In addition, the trial court awarded Wife alimony *in solido* in the amount of $220,000. Husband was ordered to pay $45,000 the first year, reduced by $5,000 each subsequent year, ending after eight years and payable in equal monthly installments due on the first day of each month. From this decree, Wife now appeals.

Wife raises numerous issues on appeal. Wife contends first that the trial court erred in not awarding her sole custody of Geoff. Further, Wife asserts that as legal custodial parent of the child she should have the right to attend to Geoff's health care needs without prior consultation with Husband. Secondly, Wife contends that the visitation schedule set by the trial court is disruptive for Geoff and that the trial court failed to set reasonable parameters on Husband's visitation based upon Husband's on call schedule. Third, regarding alimony, Wife asserts that the trial court erred in admitting the testimony of a certified public accountant concerning the range of salaries available in the nursing and legal fields.

Both parties assign as error the trial court's award of alimony *in solido*. Wife contends that the trial court erred in failing to award her alimony *in futuro*, in addition to alimony *in solido*, and in failing to provide for increases in Wife's alimony in proportion with inflation or a future showing of an increase in Husband's ability to pay and Wife's increase in need. Husband argues that the award of alimony *in solido* is excessive considering the $61,000 in joint funds appropriated by Wife and the $5,000 per month Husband paid in temporary alimony and child support pending trial. Wife

6

contends on appeal that the trial court committed error in failing to award her attorney's fees and expert witness fees.

Our review of the trial court's findings of fact in this case is governed by Tennessee Rule of Appellate Procedure 13(d), which provides that a review of the findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the factual findings, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1988); *Loyd v. Loyd*, 860 S.W.2d 409, 411 (Tenn. App. 1993).

Wife argues that the trial court erred in not awarding her sole custody of Geoff when it was undisputed that she had been the child's primary caregiver since birth. Wife contends that joint custody cannot work because the parties disagree regarding Geoff's need for medical care as well as the issue of child care for Geoff when Husband is on call. Wife argues that the trial court abused its discretion in creating an arrangement whereby Wife is "primary custodial parent" during most of the year and Husband is "primary custodial parent," during designated periods during summer vacation and Christmas holidays when Husband is exercising visitation. She also contends that the visitation schedule is disruptive and results in Geoff being "passed back and forth." In addition, Wife objects to the trial court's holding that, after conferring, both parties may take Geoff to see doctors and dentists.

Tennessee Code Annotated § 36-6-101(a)(1) requires that custody of children in divorce be determined "as the welfare and interest of the child or children may demand . . . ." Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 1998). In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983), the Court outlined a common sense approach in determining custody cases, the doctrine of "comparative fitness." The *Bah* Court noted that "[t]he paramount concern in child custody cases is the welfare and best interest of the child." *Bah*, 668 S.W.2d at 666; *see also Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996); *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. App. 1993). This determination depends on the facts in each case. *Koch*, 874 S.W.2d at 575. Tennessee Code Annotated § 36-6-106 sets forth factors to be considered in custody determinations:

> (1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . .;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106 (Supp. 1998). Most of the statutory factors in this case are not in dispute. Geoff unquestionably loves both parents and is loved by both of them. Both parents have provided him with necessities. There is no question as to the mental or physical health of either parent, and Geoff is doing well in school. Geoff expressed no preference for either parent. On the second and third statutory factors, this Court has stressed the importance of stability and "continuity of placement" for children in custody and visitation cases. *Sensing v. Dodson*, No. 01-A-01-9701-JP00042, 1997 WL 671995, at *3 (Tenn. App. Oct. 29, 1997) (citing *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993)). *See also Sartoph v. Sartoph*, 354 A.2d 467, 473 (Md. 1976); *Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn. App. 1991) .

Tennessee Code Annotated § 36-6-101 (a)(2) addresses joint custody, providing that "neither a preference nor a presumption for or against joint legal custody, joint physical custody, or sole custody is established . . . ." Tenn. Code Ann. § 36-6-101(a)(2) (Supp. 1998). The success of joint custody arrangements depends upon a "high degree" of cooperation between the parties. *Dix v. Carson*, No. 02A01-9704-CV-00093, 1998 WL 886555, at *11 (Tenn. App. Dec. 17, 1998) (citing

8

*Winchester v. Winchester*, No. 02A01-9604-CH-00092, 1997 WL 61508, at *3 (Tenn. App. Feb. 14, 1997); *Jones v. Jones*, No. 01-A-01-9601-CV00038, 1996 WL 512030, at *5 (Tenn. App. Sept. 11, 1996)).

In Tennessee, the term "joint custody" has no established definition. *See Martin v. Martin*, No. 03A01-9708-GS-00323, 1998 WL 135613, at *2 (Tenn. App. Mar. 26, 1998) (noting that trial court defined joint custody as "equal input by both parties as to decision making for the children's general welfare, health, education, and extra-curricular activities"); *Gray v. Gray*, 885 S.W.2d 353, 356 (Tenn. App. 1994) (defining "joint custody" broadly as "shared custody and shared responsibility for support"). Trial courts are not limited by a narrow definition of joint custody and may outline each party's responsibilities concerning care of the children. *Schwalb v. Langlois*, No. 01A01-9304-CV-00152, 1993 WL 415766, at *2 (Tenn. App. Oct. 13, 1993).

On the issue of joint custody, the record indicates that the parties have had some disagreements about Geoff's care, such as the seriousness with which each parent regards his asthma. However, both parties testified that they are supportive of the other parent's relationship with Geoff. Although Mother objected to the visitation schedule ordered in the decree, she indicated a willingness for Husband to spend substantial time with Geoff and acknowledged their "special relationship." Likewise, Husband admitted an awareness that children in divorce need both parents and expressed a willingness to parent with Wife. The testimony also indicates that the parents have "covered" for each other with Geoff when conflicts arose, such as Husband bringing Geoff to Wife's home when he was called to the hospital to perform a cardiac catheterization. In all, the record reflects a reasonable degree of cooperation between the parents to work together in Geoff's best interest. Under these circumstances, the evidence does not preponderate against the trial court's award of joint custody with a designation of the primary custodial parent.

The trial court's designation of primary custodial parent, however, is unusual and confusing. The decree states:

> Plaintiff [Wife] shall be the primary custodial parent, with the exception of the period of time during the child's summer vacation and the Christmas holidays when Defendant [Husband] is exercising visitations as hereinafter provided. For that portion of the child's summer vacation and the Christmas holidays when Defendant is exercising visitation, Defendant [Husband] shall be the primary custodial parent.
> . . .
>
> Plaintiff and Defendant are to confer on all major decisions concerning the child.

9

> Both parties shall have the right after conferring to take the child to and from the offices of doctors, dentists or other health care providers and to confer with these providers as necessary regarding the health and well being of the child.

The decree is clear in its directive that the parties are to confer on major decisions and make a genuine attempt to reach agreement. However, the fact that the designation of primary custodial parent changes during the year creates confusion and uncertainty. In this situation, it is unclear how the parents are to resolve disputes on long-term decisions, such as which school Geoff will attend, short of court intervention. There is no indication in the record that the trial judge intended for the parties to bring such decisions to court. The trial court's designation of which parent has primary custody and which has secondary custody needs to create "a definite allocation of duties and responsibilities between them." *Schwalb*, 1993 WL 415766, at *2.

Short of reversing the trial court's decision on this issue, the best alternative appears to be clarification of the trial court's ruling. It is undisputed that during the marriage Wife was Geoff's primary caregiver and was responsible for the majority of decisions affecting his well-being. The trial court's designation of Wife as primary custodial parent is consistent with this fact. As clarification, Husband's designation as primary custodial parent during his visitation over the Christmas holidays and summer vacation shall pertain to short-term decisions limited to that period of time. As to long-term decisions, Wife shall remain the primary custodial parent. The parties remain obliged to confer on major decisions and make a genuine effort to reach agreement.

The trial court's decree appears to treat Geoff's medical care differently from other major decisions; the trial court ordered that, after conferring, both parties could take the child to health care professionals. While this is somewhat inconsistent with Wife's designation as primary custodial parent, it is not unwarranted under the circumstances of this case. Both parents are trained health care professionals. While Wife objected that Husband did not treat Geoff's asthma seriously, there is evidence in the record from which the trial court could have concluded that Wife was overprotective of Geoff. Moreover, while the parties differed as to how "serious" Geoff's asthma is, there is no evidence that the parents worked at cross-purposes, such as Husband failing to give Geoff asthma medicine prescribed by a physician selected by Wife. Therefore, the evidence does not preponderate against the trial court's ruling on this issue.

Therefore, the trial court's decision to award the parties joint custody with a designation of primary custodial parent is affirmed. The designation of primary custodial parent, as clarified, is affirmed. To the extent that the clarification of the decree on primary custodial parent is a modification, this decision is affirmed as modified. The trial court's decision that, after conferring, both parties may take Geoff to see health care professionals, is affirmed.

Wife also questions the parenting schedule ordered by trial court, with Geoff at his father's home every other week from Wednesday after school to the following Monday morning, and on Wednesday night in the alternate weeks. During summer vacation, this schedule is reversed, with Geoff at his mother's home during these time periods. Wife contends that the parenting schedule set by the trial court is extremely disruptive and results in "passing the child back and forth." Also, Wife argues that the trial court failed to fashion a parenting schedule which recognized Husband's call schedule and asserts that "reasonable parameters" must be placed on Husband's visitation due to his call schedule. Wife proposes that Husband not have visitation every fifth week while he is on call and that Husband should notify Wife when he is called to the hospital for an emergency, so that she can care for Geoff. Wife maintains that taking Geoff to the hospital in the middle of the night and leaving him in Husband's office without supervision is unacceptable. Husband argues that his schedule allows him flexibility in caring for Geoff and that his call schedule has not presented a problem in his ability to care for Geoff. Husband asserts that it is in Geoff's best interests to continue the parenting schedule set out by the trial court. Husband also argues that his call schedule has not presented a problem in his ability to care for Geoff.

As noted by Wife, the parenting schedule set forth by the trial court in this case is incongruent with the parties' history, since it is undisputed that Wife was the child's primary caregiver until the parties separated and that Husband's substantial involvement in Geoff's upbringing came about only after the parties decided to divorce. This Court has repeatedly emphasized the importance of stability and continuity in the lives of children of divorced parents. *See Gaskill*, 936 S.W.2d at 630. Such continuity and stability is normally achieved by making the parent who was the primary caregiver during the marriage the primary custodial parent, in the allocation of parenting time as well as in decisionmaking on matters affecting the child. *See Brooks v. Carter*, No. 02A01-9709-CV-00225 (Tenn. App. Feb. 2, 1999) (reversing trial court's designation of father as primary custodial parent and ordering joint custody with mother as primary custodial

11

parent where mother had been primary caregiver during marriage); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. App. 1991) (affirming award of joint custody with father as primary custodial parent where father had been children's primary caretaker during latter part of parties' marriage). However, where the parent who has been the primary caregiver during the marriage is deemed the less fit parent, it is necessary to award primary custody to the parent who was not the primary caregiver. *See Grover v. Grover*, No. 01A01-9804-CH-00197 (Tenn. App. Apr. 30, 1999); *Gaskill*, 936 S.W.2d at 630-31.

In this case, the allocation of parenting times gives Geoff somewhat more time in Wife's home, although the time spent with each parent is nearly equal. This is inconsistent with the fact that Wife was Geoff's primary caregiver during the marriage. However, the record includes evidence from which the trial court could have concluded that it was in Geoff's best interest to spend more time with his father. The guardian ad litem testified about her concerns that Wife would move to Michigan where her extended family lives and her belief that Wife would be more likely to stay in Tennessee if Husband were awarded custody of Geoff. The guardian ad litem stated that Wife was angry at her for speaking with Geoff and that Wife did not want her to obtain any information from psychologists who had treated Wife. The guardian ad litem also felt that Wife was not genuinely supportive of Husband's relationship with Geoff. As noted above, there was some indication that Wife is overprotective of Geoff. The guardian ad litem found both parties to be good and loving parents, but repeatedly emphasized the quality of Husband's relationship with Geoff:

> [Stark]: The problem is . . . I do not believe it is in Geoffrey's best interest for him to not have very frequent and extended visitation with both parents. Dr. Burlew, from everything I have been able to find out, both from my interview with him and my interview with people who knew him, this man is special. Both parents are good parents, do not get me wrong. . . . [B]ut, from everything I could figure out, including my interview with Geoff, Geoff has a special relationship with Dr. Burlew . . . . [Geoffrey] was much more verbal, much more detailed, much more animated when he talked about what he did with his father than what he did when he talked about what he did with his mother.

In addition to considering which parent was the child's primary caregiver during the marriage, the trial court must consider the willingness of each parent to encourage a close and continuing relationship with the other parent. Tenn. Code Ann. § 36-6-106(10) (Supp. 1998). The trial court could also consider Wife's attitude regarding the investigation by the guardian ad litem, as well as the concerns raised by the guardian ad litem. Appellate courts are reluctant to reverse a trial court's custody decision because "[c]ustody and visitation determinations often hinge on subtle

factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill*, 936 S.W.2d at 631. The trial court, not the appellate court, is in the position to observe the demeanor of the parties and assess their credibility. *Brewer v. Brewer*, 869 S.W.2d 928, 934 (Tenn. App. 1993). Consequently, the trial court's overall parenting schedule is affirmed.

Wife raises concerns on appeal regarding Husband's care for Geoff when he is "on call." She argues that he should not have scheduled parenting time when he is on call every fifth week and that, when he is called to the hospital at other times, he should be required to have Wife take care of Geoff, rather than bringing Geoff to the hospital with him. The trial court made no provisions for this in the final decree.

As noted above, Husband's first "call" schedule occurs every fifth week. During this week, Husband must take telephone calls regarding other physicians' patients. His unrefuted testimony was that these can almost always be managed by telephone. In addition, every fifth weekend, Husband must make rounds at the hospital on Saturday and Sunday mornings, a task which takes from one to four hours. The second "call" schedule means that Husband may be required to go to the hospital to perform an emergency cardiac catheterization at any time of the day or night. Husband's testimony indicated that this occurs with "random frequency" and had happened only once while Geoff was Husband's care in the two years the parties were separated. On this occasion, Husband brought Geoff to Wife's home.

Husband's witness, Dr. Soberman, indicated a belief that there was no problem with leaving a child Geoff's age unattended in the hospital while the parent sees patients or performs medical procedures. We find this troubling. Husband's call schedule does not interfere so significantly with Geoff's care that Husband should not have scheduled parenting time during those periods. However, the decree should be modified so that Geoff is not left unattended at the hospital while Husband tends to patients. If Husband is required to see patients at the hospital, whether making rounds on a weekend morning or performing an emergency medical procedure, if Husband is not able to have Geoff with him and supervise him, he must either have Wife care for Geoff or, if that is not practicable, have a responsible adult designated to care for Geoff in Husband's absence. The order of the trial court must be modified to add this requirement.

Wife also appeals the trial court's order regarding alimony. The trial court awarded Wife alimony *in solido* in the amount of $220,000. The court ordered Husband to pay $45,000 the first

year, reduced by $5,000 each subsequent year, ending after eight years. Wife argues that the trial court erroneously admitted the testimony of certified public accountant William Watkins on the range of available salaries in the medical community and in the legal community in Memphis for which Wife would be qualified. Wife argues that Watkins was not qualified as an expert to give such testimony and that the testimony constituted hearsay. Both parties appeal the trial court's order regarding alimony. Wife contends that the trial court erred in awarding alimony *in solido* instead of alimony *in futuro* and that the trial court failed to provide for increases in Wife's alimony in proportion with inflation or a future showing of an increase in Husband's ability to pay or Wife's increase in need. Husband argues that the amount of alimony *in solido* awarded was excessive.

As noted above, Watkins testified to a range of salaries available to Wife in the nursing field and in the legal profession in Memphis, based upon information gathered from telephone calls, the local newspaper and surveys conducted by several local hospitals. At trial, Wife challenged Watkins' qualifications as an expert, arguing that Watkins was not qualified to testify regarding a range of salaries available to Wife in the health care field and in the legal profession merely because he has clients in those fields. In addition, Wife argued that Watkins' testimony constituted hearsay.

Tennessee Rule of Evidence 702 provides that: "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. In order to qualify as an expert, the witness must have "some special as well as practical acquaintance with the immediate line of inquiry." **Benson v. Fowler**, 306 S.W.2d 49, 63 (Tenn. App. 1957) (quoting **Powers v. McKenzie**, 16 S.W. 559, 562 (Tenn. 1891). **See also Bradford v. City of Clarksville**, 885 S.W.2d 78, 83 (Tenn. App. 1994). The expert must possess "thorough knowledge" of the subject matter that is not within the knowledge or experience of the average person. **Otis v. Cambridge Mut. Fire Ins. Co.**, 850 S.W.2d 439, 443 (Tenn. 1992) (citing **Kinley v. Tennessee State Mut. Ins. Co.**, 620 S.W.2d 79, 81 (Tenn. 1981)). The trial court's finding as to whether a witness qualifies as an expert will be upheld unless the trial court erred regarding the witness' qualifications and the error was prejudicial. **Bradford**, 885 S.W.2d at 83 (citing **Underwood v. Waterslides of Mid-America, Inc.**, 823 S.W.2d 171, 182 (Tenn. App. 1991)).

In this case, Watkins was qualified to testify regarding matters within his field of expertise as a certified public accountant. However, there was no showing that he was qualified as a vocational expert to testify regarding the jobs for which Wife was qualified, based on her education and experience and considering her years as a homemaker, and the compensation she could expect to earn. Since Watkins' testimony is the only testimony Husband presented on the issue of Wife's earning capacity, apart from Husband's testimony, it was clearly prejudicial. Consequently, we must conclude that the trial court erred in admitting Watkins' testimony on the issue of Wife's earning capacity.

The trial court awarded Wife alimony *in solido* in the amount of $220,000. The trial court ordered Husband to pay $45,000 the first year, reduced by $5,000 each subsequent year and ending after eight years. Wife cites *Aaron v. Aaron*, 909 S.W.2d 408 (Tenn. 1995), for the proposition that, in determining alimony, the most important factor is the need of the spouse seeking support. Wife argues that the trial court erred in awarding her alimony *in solido* rather than alimony *in futuro*.

Husband contends that an award of alimony *in solido* is appropriate but argues that the amount awarded was excessive. He notes that Wife spent $61,187.57 in joint funds, with the majority of the funds utilized for Wife's attorney's fees. Husband argues that he paid Wife $5,000 per month temporary alimony and child support, and that these constituted "tax free payments" to her, totaling $105,000. Husband contends that, in light of her education, training and experience, Wife has the ability to earn a substantial income.

The determination of an amount of alimony is in the discretion of the trial court. Tenn. Code Ann. § 36-5-101(d) (Supp. 1998). *See also Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. App. 1988); *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. App. 1986) (citing *Newberry v. Newberry*, 493 S.W.2d 99 (Tenn. App. 1973). Tennessee statutes permit three types of alimony: (1) rehabilitative alimony, which is temporary support to enable a spouse to obtain the ability to support himself or herself at a certain level; (2) periodic alimony or alimony *in futuro*, which is permanent alimony to benefit an economically disadvantaged spouse; (3) alimony *in solido*, which is a lump sum payment to a spouse. *See* Tenn. Code Ann. § 36-5-101(d)(1) (Supp. 1998). Under Tennessee Code Annotated § 36-5-101(d), the factors considered in determining alimony are:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

15

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so;  and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The statute reflects a policy in favor of rehabilitative alimony.  *See* Tenn. Code Ann. § 36-5-101 (d)(1) (Supp. 1998); *Aaron*, 909 S.W.2d at 410.  The statute provides further:

It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance.  Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3).

Tenn. Code Ann. § 36-5-101 (d)(1) (Supp. 1998); *see Self v. Self*, 861 S.W.2d 360, 361 (Tenn. 1993).

The Tennessee Supreme Court in *Aaron v. Aaron* noted that "the real need of the spouse seeking the support is the single most important factor." *Aaron*, 909 S.W.2d at 410 (quoting *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. App. 1989)).  In addition to the need of the disadvantaged spouse, the ability of the obligor spouse to provide support is considered. *Id.* at 410-11.  Fault of a spouse in precipitating a divorce is also a consideration when determining an alimony award.  Tenn. Code Ann. § 36-5-101 (d)(1)(K). *See also Aaron*, 909 S.W.2d at 410-11; *Gilliam*, 776 S.W.2d at 86.  The amount of alimony should be determined so "that the party obtaining the divorce [is not] left in a worse financial situation than he or she had before the opposite party's

misconduct brought about the divorce." ***Shackelford v. Shackleford***, 611 S.W.2d 598, 601 (Tenn. App. 1980); *see **Rush v. Rush***, 232 S.W.2d 333, 334 (Tenn. App. 1949); ***McClung v. McClung***, 198 S.W.2d 820, 822 (Tenn. App. 1946).

In the present case, Husband is in his mid-forties and is a cardiologist at the University of Tennessee and UT Medical Group. In 1997, Husband's income was approximately $200,000. Wife is also in her mid-forties. Wife's situation is unique. Wife holds two degrees in nursing, a law degree, and is completing a master's degree in business administration. However, by agreement of the parties, Wife has not been employed outside the home since 1986, except for part-time work to maintain her nursing licenses.

The parties were married approximately twenty-four years. During the marriage, Husband attended medical school and began his career as a cardiologist. From approximately 1979 until 1986, Wife worked full-time while Husband attended medical school and completed years of residencies and fellowships. Wife moved several times in furtherance of Husband's career. Because of these moves, Wife's retirement benefits never vested, and she forfeited her retirement benefits. When they moved to Memphis, the parties began attempting to conceive a child, and Wife began law school. When Geoff was born in 1990, shortly after Wife obtained her law degree, the parties agreed that she would stay home to raise Geoff.

Thus, during the course of this marriage, Wife substantially contributed to Husband's earning capacity. She financially supported Husband throughout his training as a physician. In addition, she relocated with Husband several times in support of his career and, as a result, forfeited employment benefits. Husband likewise supported Wife's education after she obtained her nursing degree, such as Wife obtaining a law degree. However, by agreement of the parties, Wife did not seek outside employment and remained at home to care for the parties' minor child. Consequently, while Wife has as much education as Husband, she has not utilized her training because of the parties' understanding that she would stay at home with Geoff. Due to her age and her dated skills, Wife has had difficulty in obtaining a job in the legal community.

Excluding the testimony of Husband's expert, William Watkins, on the issue of Wife's earning capacity, the only testimony in the record on this topic is testimony from Wife and from Husband. Wife testified that she anticipated earning approximately $30,000 per year. Her expert, Robert Winfield, testified that Wife's earning capacity was $30,000 per year, but his testimony was

simply based on information he obtained from Wife. Husband testified that Wife could earn anywhere from $35,000 to $65,000.

Husband's Rule 15 affidavit showed a gross monthly income from the University of Tennessee and the UT Medical Group of $14,500.92 and $33,308.12 per year from bonuses and other sources. His net monthly income, excluding $33,308.12 from bonuses and consulting work, is $9,797.99. Husband listed $9,723 in monthly expenses, including $5,000 per month in pendent lite alimony and child support. Wife's affidavit showed no source of income and $4,713 in monthly expenses, excluding expenses for Geoff.

While Wife's earning capacity is unclear based on the admissible proof in the record, it is clear that Wife has substantially less earning capacity relative to Husband. Therefore, she has substantial need for alimony. Based on Husband's earnings, he has the ability to pay alimony. In addition, Husband substantially contributed to the termination of the marriage; the trial court awarded the divorce to Wife based on inappropriate marital conduct. As noted above, a wronged spouse should not be in a worse financial situation than prior to the opposite party's misconduct which brought about the divorce. *See Gilliam*, 776 S.W.2d at 86; *Shackelford*, 611 S.W.2d at 601; *see Rush*, 232 S.W.2d at 334; *McClung*, 198 S.W.2d at 822.

Therefore, based on Wife's limited earning capacity because of the parties' decision that she stay home to raise Geoff, Husband's ability to pay alimony, the long duration of the marriage, the standard of living enjoyed by the parties during the marriage, and the relative fault of Husband in bringing about the divorce, we conclude that an award of rehabilitative alimony in an amount not less than $1,000 per month is warranted, beginning no later than three years after the date of the original decree, in addition to the award of alimony *in solido* by the trial court. The cause is remanded to the trial court for a determination of the appropriate amount of rehabilitative alimony and an appropriate start date for the monthly payments. In addition, on remand, the trial court should determine when Wife could reasonably be expected to reach an income level commensurate with her education, and set a reasonable period of time for the termination of the monthly rehabilitative alimony payments.

Finally, Wife argues that the trial court erred in declining to award her attorney's fees and expert witness fees. Wife contends that she has insufficient funds to pay these fees and would have to take out a loan or encroach upon assets in order to pay the fees. On the other hand, Husband

contends that Wife appropriated approximately $61,000 in joint funds, the majority of which were utilized for Wife's attorney's fees.

The award of attorney's fees is within the sound discretion of the trial court and will not be disturbed on appeal unless the evidence preponderates against the trial court's finding. *Lyon v. Lyon*, 765 S.W.2d 759, 762-63 (Tenn. App. 1988). An award of attorney's fees is treated as alimony, and the trial court should consider the factors set out in Tennessee Code Annotated § 36-5-101(d)(1). *See Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. App. 1992).

It is undisputed that Wife utilized approximately $36,000 in joint funds for attorney's fees. In addition, Wife employed four different attorneys for this litigation. Under the circumstances, the evidence does not preponderate against the trial court's denial of attorney's fees and expert witness fees to Wife. Therefore, the trial court's decision as to attorney's fees and expert witness fees is affirmed.

In sum, the trial court's award of joint custody of the parties' minor child, with a designated primary custodial parent, is affirmed. The designation of primary custodial parent is clarified as follows: Wife is the primary custodial parent for all decisions except those which pertain only to the time periods in which Husband is the designated primary custodial parent, i.e., during his visitation over the Christmas holidays and the child's summer vacation. The parties are obliged to confer on major decisions and make a bona fide effort to reach agreement. The trial court's decision that both parties, after conferring, could take the child to see health care professionals is affirmed. The trial court's parenting schedule is affirmed with the modification that, if Husband is required to see patients at the hospital while the child is in his care, if Husband is not able to have the child with him and supervise him, he must either have Wife care for the child or, if that is not practicable, have a responsible adult designated to care for the child.

The trial court's award of alimony *in solido* is affirmed. The trial court's denial of Wife's request for alimony *in futuro* is also affirmed. The trial court's denial of Wife's request for rehabilitative alimony is reversed. The cause is remanded to the trial court for a determination of when Wife could reasonably be expected to attain an income level commensurate with her education and for an award of rehabilitative alimony in an amount not less than $1,000 per month beginning no later than three years after the date of the original decree, and setting an appropriate date for

termination of the monthly rehabilitative alimony payments. The trial court's denial of Wife's request for attorney's fees or expert witness fees is affirmed.

The decision of the trial court is affirmed in part, reversed in part, modified as set forth above, and remanded for further proceedings consistent with this Opinion. Costs on appeal are taxed equally to Appellant and to Appellee, for which execution may issue if necessary.

_____
**HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**