# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 12, 2014 Session

## CLEVELAND CUSTOM STONE, ET. AL. v. ACUITY MUTUAL INSURANCE COMPANY

**Appeal from the Chancery Court for Bradley County**
**No. 2011CV104    Hon. Michael J. Sharp, Judge[1]**

---

**No. E2013-02132-COA-R3-CV-FILED-JUNE 10, 2014**

---

This case concerns Acuity's refusal to pay insurance proceeds to Plaintiffs, who filed suit, alleging negligence, breach of contract, bad faith refusal to pay, and violations of the Tennessee Consumer Protection Act, codified at Tennessee Code Annotated section 47-18-101, et. seq. The case proceeded to jury trial. The jury awarded Plaintiff compensatory damages and found that Acuity's failure to pay was in violation of the Tennessee Consumer Protection Act. The jury declined to award punitive damages. Likewise, the trial court affirmed the verdict but did not treble the damages. Acuity appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Stuart F. James, Chattanooga, Tennessee, for the appellant, Acuity Mutual Insurance Company.

Robert G. Norred, Jr. and Matthew G. Coleman, Cleveland, Tennessee, for the appellees, Cleveland Custom Stone, Inc. and Steve's Stone Works.

---

[1]Sitting by interchange.

**OPINION**

## I. BACKGROUND

Chad Roberts and Steve Tourigny (collectively "Plaintiffs") formed Cleveland Custom Stone, Inc. ("CCS") to manufacture stone siding in Cleveland, Tennessee. Plaintiffs were related by way of Mr. Tourigny's marriage to Mr. Roberts' sister, Wendi Tourigny. Once CCS was established, Mr. Roberts worked off-site in Texas to ensure that the company was financially viable, while Mr. Tourigny was responsible for the day-to-day operations and Mrs. Tourigny served as the office manager. Plaintiffs rented a building at 2011 King Edward Avenue in Cleveland, Tennessee to house the operations and procured insurance coverage from Acuity Mutual Insurance Company ("Acuity") through an agent with U.S. Insurance Group, LLC ("USIG"), which maintained an agency agreement with Acuity.

When CCS became successful in 2007, Plaintiffs purchased the adjacent building at 2013 King Edward Avenue to permanently house the operations. Prior to the purchase of the new building, Plaintiffs sought to add insurance coverage for the building. USIG provided a certificate of insurance form at the closing of 2013 King Edward Avenue. As the economy declined, the success of CCS correspondingly declined. Plaintiffs had listed the building and CCS for sale when a fire destroyed the building on February 14, 2010.

By that time, USIG had also ceased operations.[2] Plaintiffs notified Acuity of the loss. Acuity responded by notifying Plaintiffs that they had never successfully added coverage for 2013 King Edward Avenue. Plaintiffs filed suit, alleging that Acuity was negligent for failing to add the coverage as requested, that Acuity had breached its contract, that the breach was in bad faith, and that Acuity violated the Tennessee Consumer Protection Act ("TCPA"). Acuity denied wrongdoing and alternatively claimed that Plaintiffs were not entitled to recovery because they had intentionally set the fire.

The case proceeded to a jury trial at which several witnesses testified. Mr. Roberts testified that he currently resided in Houston, Texas, where he ran another company, Interior Magic. He recalled that Mr. Tourigny sought help in creating a business that manufactured stone based upon the success Mr. Tourigny had realized in the installation business, Steve's Stone Works. He assisted Mr. Tourigny in creating a business plan, and he contributed approximately $90,000 to the partnership. He stated that they initially leased a 6500 square foot building at 2011 King Edward Avenue to house their operations.

---

[2] Richard P. Jahn, Jr., a licensed attorney and bankruptcy trustee, testified that he had been assigned as USIG's bankruptcy trustee in June 2009. He asserted that USIG had not been in business since his assignment as trustee and that USIG currently held no contracts and would never be reformed.

Mr. Roberts testified that they contacted three different companies in their attempt to procure insurance for the leased property and the contents of the business. Mrs. Tourigny contacted the companies, compared the quotes, and arranged the meetings. He met with Leah Hammock, a representative from USIG, and decided to procure insurance from USIG "because their rates were better and [they] just felt like [they] had a better first meeting with them than the other two companies." He received an insurance book from USIG that contained the original policy for the policy period of May 2006 to May 2007. He claimed that they initiated an electronic funds transfer to pay the insurance premium automatically from their checking account each month.

Mr. Roberts testified that in 2007, they began the process of purchasing the adjacent 7500 square foot building at 2013 King Edward Avenue because they believed it would be a beneficial investment for the business. He recalled that they were required to obtain insurance on the building before they could secure a loan from AmSouth Bank to purchase the building. He contacted USIG, and Ms. Hammock visited the 2013 King Edward Avenue building and provided them with a quote that included building and worker's compensation coverage. They declined the worker's compensation coverage but accepted the coverage for the building. He recalled receiving a quotation evidencing their selection of coverage. He believed that he ultimately obtained coverage similar to what was depicted in the quotation as evidenced by the certificate of property insurance that was sent to AmSouth Bank prior to closing. The certificate of insurance identified Acuity as the "company affording coverage," USIG as the "producer," and CCS as the "insured." The certificate further provided, in pertinent part,

> THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

The certificate also reflected that AmSouth Bank was added as an additional insured and mortgagee of 2013 King Edward Avenue. He acknowledged that he was never personally told that he had received insurance coverage for the building and that the corresponding policy did not reflect insurance coverage for the building. He conceded that he never read any of the actual policies even though the initial quote provided that the policy was the only document that dictated the type and amount of insurance coverage.

Mr. Roberts testified that the business continued in its profitability until approximately 2008. Despite the decline in business, they continued their automatic payment of the insurance premiums throughout the years, except for one instance when they switched bank accounts and had to send a new voided check to restart the automatic draft of the premiums. In 2009, they listed the property for sale. He acknowledged that he was less involved in CCS because his business in Texas had continued to flourish. Mr. and Mrs. Tourigny were also going through a divorce during that time. As a result of the divorce, Mrs. Tourigny's responsibilities with CCS were delegated to a new employee, Deborah Beshears.

Mr. Roberts claimed that he was in Houston, Texas when the fire occurred and that he could not remember the exact date of his last visit to CCS before the fire. He recalled that the fire had burned through the front part of the building that housed the office and the break room and that the front windows had been broken. A few items were also missing from the property, namely a Bobcat machine and a trailer. He related that they were unable to fill their existing orders because of the fire damage.

Mr. Roberts testified that he began the process of filing a claim the day after the fire. He spoke with Lisa White, Acuity's senior field claims representative, who asked questions about the building and the fire. He claimed that Ms. White did not have the 2013 King Edward Avenue address on file and that she only had record of the 2011 King Edward Avenue address. He returned to Cleveland a few weeks later and met with Mr. Tourigny, Ms. White, and Mike LaPointe, an arson investigator hired by Acuity. He was surprised by the investigation, but he cooperated and informed them that a prior employee may have been responsible for the fire. He completed a proof of loss form and repeatedly inquired as to the status of his claim until he received a letter from Acuity on April 27, 2010. In the letter, Ms. White advised Plaintiffs that they never had building coverage and that he had not returned the proof of loss form. Ms. White also stated that Acuity reserved the right to deny the claim based upon the investigation into the cause of the fire. He insisted that he had already provided a proof of loss form. Nevertheless, he instructed his attorney to send a second form.

Rebecca Guest testified that she had previously worked for USIG until 2009. She explained that USIG did not issue policies of insurances. USIG procured insurance coverage for its customers from many different sources, including Acuity. She represented her customers' interests, and her goal was to get the best premium with the best coverage for each customer. She used a standard application for each customer, regardless of the insurance carrier selected. She helped Plaintiffs initially procure insurance coverage from Acuity and later spoke with either Mr. or Mrs. Tourigny about adding coverage for the purchase of 2013 King Edward Avenue. She stated that in working with Plaintiffs, she contacted Kelly Jelinek, an Acuity underwriter, who provided a quote with the addition of the new property. She acknowledged that Plaintiffs rejected the initial quote.

-4-

Relative to the certificate of property insurance, Ms. Guest testified that such certificates were routinely used to "provide information on current insurance that is in effect at the time that the certificate was issued." She identified the certificate of insurance at issue and asserted that the document specifically provided that Plaintiffs had procured building coverage for the policy period of May 2007 through May 2008. She acknowledged that the certificate was "only good for" the term listed on the certificate. She related that all discussions concerning coverage and policy limits would have taken place before the certificate was issued to provide evidence of coverage for third parties. She stated that she would not have submitted an application to add building coverage to the existing policy because Acuity would have simply issued an endorsement adding the location to the policy, which would automatically renew at the expiration of each policy period. She admitted that she never received an endorsement and could not speculate as to the reason for the lack of an endorsement. She stated that either she or Acuity made a mistake. She claimed that if Plaintiffs sought to suspend building coverage, they were required to notify USIG, which would notify Acuity, which would, in turn, issue another endorsement removing coverage.

Terri Boyd, a branch manager for Regions in Cleveland, Tennessee, testified that she initially worked for AmSouth before it merged with Regions in 2006. She recalled meeting with Plaintiffs to discuss the purchase of 2013 King Edward Avenue and that they ultimately purchased the property after obtaining a loan from AmSouth. She asserted that the certificate of insurance was included in the closing documents because Plaintiffs were required to provide proof of insurance before the funds on the loan could be dispersed.

Mrs. Tourigny testified that she helped establish CCS and later served as the secretary from 2006 until 2009. Despite her contributions, she never held an independent ownership interest in CCS. Throughout her employment with CCS, she was responsible for bookkeeping, opening bank accounts, arranging utility services for CCS, and procuring insurance quotes. She met with Ms. Hammock in 2006 when she procured insurance through USIG and spoke with her again in 2007 to request information on insurance coverage concerning the purchase of 2013 King Edward Avenue. She claimed that Ms. Hammock visited the property and then provided a quote for insurance coverage. After reviewing the quote, she contacted USIG and spoke with Ms. Guest because Ms. Hammock had left the company. She informed Ms. Guest that the quote listed the wrong address. She stated that Plaintiffs ultimately accepted coverage for the building but denied the worker's compensation coverage that was included in the quote. Prior to closing, she contacted USIG again and requested a certificate of insurance. She related that they consistently paid the insurance premiums, which slightly increased after they added building coverage. She acknowledged that their premium payments were late on at least two occasions but that she confirmed that there was not a lapse in coverage during that time. She claimed that they never received a copy of the actual insurance policy.

Ms. White testified that she had worked for Acuity since 2008 and that she handled approximately 200 to 250 claims per year. She could not recall how many claims Acuity had denied in the last two years. She acknowledged that Acuity and USIG conducted business pursuant to an agency agreement that allowed USIG to "[s]olicit, receive and transmit to [Acuity] proposals for insurance contracts" and to "[b]ind and execute insurance contracts" for Acuity. She stated that she was assigned to the claim at issue in this case as a field adjuster and that she advised Mr. Roberts that Acuity would need to conduct an origin and cause investigation into the fire. She visited the site and was present when Plaintiffs realized that the Bobcat equipment and trailer were missing from the property. She acknowledged that Plaintiffs had fired an employee, John Gooch, approximately three months before the fire because that employee was suspected to have stolen items from CCS. She conceded that Acuity never interviewed Mr. Gooch regarding his potential involvement in the fire or theft. She claimed that Mr. Tourigny was "[v]ery defensive and agitated" during his interview. The investigation revealed that CCS was behind several months in its mortgage payments, that business was "slow and declining," and that Mr. Tourigny was dependent upon unemployment and was not receiving a paycheck from CCS.

Ms. White claimed that she never received the proof of loss form from Plaintiffs and had only reviewed it because it was included in the discovery documents. She recalled advising Mr. Roberts that she could not find evidence of building coverage and that he informed her that they had purchased the building and hoped that the agency had not "screwed up his coverage." She spoke with Ms. Jelinek, who also did not have any evidence of building coverage and asserted that the only information in the file referred to a change in the billing address that had been requested on February 15, 2010. She later spoke to Ms. Guest, who advised her that the certificate of insurance was the only document in the file pertaining to the new building and believed that a mistake may have been made when USIG moved into a new office location around the time that Plaintiffs requested building coverage.

Michael LaPointe testified that he was the manager of the special investigations unit for Acuity and that as relevant to this case, he hired an independent investigator, James Enos, because of the circumstances surrounding the claim. After Mr. Enos conducted his review and reported his findings, Mr. LaPointe began his investigation by interviewing Plaintiffs and Mrs. Tourigny. They were not forthcoming with information, but he ultimately learned that the business was in financial decline, that CCS and the building were for sale, that Mr. Tourigny was not receiving income from CCS and was going through a divorce, and that they had recently changed the locks on the building. Mr. Tourigny claimed to have been in Georgia with his girlfriend, Melony Durham, at the time of the fire. He never received contact information for the CCS employees, despite his request for the information. He denied any knowledge of an employee named John Gooch. He ultimately concluded that the fire was of "incendiary origin," meaning that it had been intentionally set.

-6-

Mr. Enos testified that he was a fire investigator and regional fire manager for Donan Fire Investigation. He asserted that his job was to "seek the truth about what caused the fire to determine right down to the point of where the fire started." In investigating the fire in this case, he determined that there was no evidence of forced entry and the fire had been set intentionally. He found the presence of ignitable liquids and at least four areas where a fire had been set in the building.

Mr. Tourigny testified that he "never really dealt with the finances" for CCS because he was responsible for the day-to-day operations, namely manufacturing and installing the stone. He claimed that he had never read the insurance policies for CCS and had no personal knowledge of the coverage contained in the policies. He explained that he trusted Mrs. Tourigny to procure the necessary coverage for CCS. He acknowledged that Mrs. Tourigny no longer worked for CCS at the time of the fire and that he was tasked with running the business without her. He stated that despite his increase in responsibilities, he never investigated the type and amount of insurance coverage in existence at the time of the fire. He explained that he hired Deborah Beshears to replace Mrs. Tourigny as his assistant and that Ms. Beshears became responsible for the finances.

Mr. Tourigny acknowledged that CCS was in financial decline at the time of the fire and that he was reliant upon unemployment compensation. He related that a few days prior to the fire, he visited the building before he left for his father's funeral in Georgia. He was in Georgia when the fire occurred, and he was at Ms. Durham's house when he learned of the fire.[3] He denied any involvement with the fire. He recalled informing the investigators that he had recently fired Mr. Gooch because he suspected him of stealing.

The deposition testimony of Dennis R. Parish was read into the record. Mr. Parish, Acuity's underwriting manager, testified that the insurance quote did not provide coverage. He related that even if an insurance quote were accepted by the client, coverage would not be complete until the underwriting department issued a policy of insurance. He asserted that CCS never received building coverage from Acuity pursuant to the policies of insurance that were ultimately issued. He claimed that the policy was the legal and binding contract between the insured and the provider. He acknowledged that the certificate reflected that CCS held building coverage. He explained that insureds were entitled to temporary coverage when acquiring new property but that without further action by the insured, the coverage simply lapsed. He explained that the increase in Plaintiffs' insurance premium was simply a regularly-scheduled small premium increase on the renewed policy.

---

[3]Ms. Durham confirmed that Mr. Tourigny was with her that night and that he did not leave the house until he learned of the fire. She recalled that he appeared confused and shocked when he first heard of the fire.

The case was submitted to the jury, which found that USIG was Acuity's agent, that Plaintiffs had procured building coverage from Acuity, and that Plaintiffs had not intentionally set the fire. The jury awarded Plaintiffs compensatory damages but declined to award punitive damages even after finding that Acuity had violated the TCPA. Following the trial court's denial of post-trial motions and the request for treble damages, this timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Acuity as follows:

A. Whether the trial court erred in denying the motion for summary judgment.

B. Whether the trial court erred in denying the motion for directed verdict.

C. Whether the trial court erred in issuing the jury instructions.

D. Whether the trial court erred in denying the motion for new trial.

E. Whether the jury verdict was against the weight of the evidence.

CCS raised its own issues on appeal that we restate as follows:

F. Whether the trial court erred in denying the request for treble damages.

G. Whether the trial court erred in admitting the deposition testimony of Mr. Parish.

## III. DISCUSSION

### A.

Although not explicitly stated as such, Acuity takes issue with the trial court's denial of its motion for summary judgment. This issue cannot be raised at this juncture in the proceedings. "A trial court's denial of a motion for summary judgment, predicted upon the existence of a genuine issue of material fact, is not reviewable on appeal when a judgment is subsequently rendered after a trial on the merits." *Bradford v. City of Clarksville*, 885 S.W.2d 78, 80 (Tenn. Ct. App. 1994); *see also Cortez v. Alutech, Inc.*, 941 S.W.2d 891, 892 (Tenn. Ct. App. 1996). Therefore, we decline to review the propriety of the trial court's order denying Acuity's motion.

B.

Acuity asserts that the trial court erred in denying its motion for directed verdict. Acuity claims that it cannot be held liable for USIG's error because USIG acted outside the scope of the agency agreement by issuing a certificate of insurance, that CCS was barred from recovery because CCS failed to read the policy of insurance, and that CCS ultimately failed to prove that it procured building coverage. CCS responds that it submitted sufficient evidence to create an issue of fact for the jury. The Tennessee Rules of Civil Procedure provide for directed verdicts as follows:

> A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

Tenn. R. Civ. P. 50.01.

In considering a motion for a directed verdict, the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 390 (Tenn. 2006) (quoting *Crain v. Benton*, 823 S.W.2d 187, 195 (Tenn. Ct. App. 1991)); *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). A motion for a directed verdict should not be granted "if the party with the burden of proof has presented sufficient evidence to create an issue of fact for the jury to decide." *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999)). A party has created a jury issue when there is doubt about the conclusions drawn from the evidence. *Id.* The grant or denial of a motion for directed verdict is a question of law; therefore, the court's decision is subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

The record reflects that numerous witnesses, including Plaintiffs, Ms. Tourigny, Ms. Guest, and Ms. Hammock, offered testimony concerning Plaintiffs' desire to add building coverage to the existing insurance policy. Plaintiffs further testified that they negotiated for and ultimately believed that they had procured such insurance for the new property. Ms. Guest specifically testified that Plaintiffs had procured building coverage for the 2007-2008 policy period and that the coverage was subject to an automatic renewal that could only be suspended by Plaintiffs' request. While Plaintiffs could have found the error by reading the new policy, the Tennessee Supreme Court has previously held that insureds are not required to search their policies in an effort to discover errors. *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 522 (Tenn. 2012). Plaintiffs also claimed to have never received a copy of the new policy. Relative to the fire, Plaintiffs provided an alibi for their whereabouts at the time of the fire and offered an explanation for the suspicious nature of the fire, namely that Mr. Gooch may have caused the fire in retaliation for his employment termination. Reviewing the evidence in favor of CCS, as we are constrained to do, we affirm the trial court's denial of a directed verdict because CCS submitted sufficient evidence to create an issue of fact for the jury.

C.

Acuity argues that the trial court erred while reading the jury instructions by erroneously stating that USIG was Acuity's agent. Acuity claims that the relationship between USIG and Acuity was an issue of fact for the jury. However, Acuity did not cite any legal authority in its brief in support of its position. Failure to cite authority in support of an argument as required by Rule 27(a) of the Tennessee Rules of Civil Procedure constitutes a waiver of the issue. *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 105 (Tenn. Ct. App. 2001) ("Failure to cite relevant authority constitutes a waiver of the issue."). Nevertheless, Acuity raised a similar issue with supporting authority, namely that the trial court erred in including Tennessee Code Annotated section 56-6-115(b) in the jury instructions.

"Whether a jury has been properly instructed and whether an error in instruction more probably than not affected the jury's verdict are questions of law that are reviewed de novo with no presumption of correctness." *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). Section 56-6-115(b) provides, in pertinent part,

> An insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or *any policy issued in connection with the application* between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary.

(Emphasis added). "This statute serves the purpose of preventing an insurance company from denying responsibility for representations and actions from the agent from whom applications are voluntarily accepted and of protect[ing] an applicant who relies on such representations or actions." *Tarrant*, 363 S.W.3d at 517 (quotations omitted). Section 56-6-115(b) "applies to the renewal of an insurance policy as well as the application for the original policy." *Id.* In all cases, "[t]he statute is to be liberally construed in favor of the insured." *Id.*

In *Tarrant*, the insured instructed his insurance agent to place his business vans under his commercial policy. 363 S.W.3d at 513-14. The agent mistakenly added the vans to the personal policy with lower liability limits. After an accident involving one of the vans and another vehicle, the insurer refused to fulfill the claim pursuant to the commercial policy, arguing that the insured ratified the agent's mistake by consistently paying the policy premiums with accompanying bills that specifically provided that the vans had been placed under the personal policy. The Supreme Court held that the insurer was estopped from denying coverage pursuant to the commercial policy because the insurer should bear the consequences of the agent's mistake. *Id.* at 521. In so holding, the Court found that "[the insured] relied on the Jones Agency to provide the insurance coverage he requested and as a result of the Agency's mistake, the coverage was not provided." *Id.* Citing section 56-6-115(b), the Court also specifically held that the insured had not ratified the agent's mistake when the agent was acting in the stead of the insurer, not the insured. *Id.* at 518-19. In so holding, the Court noted that "[the agent], by performing the clerical tasks necessary to implement [the insured's] request, acted in the place of [the insurer], not [the insured]. [The agent] did not perform any task that [the insured] would have been able to perform himself since he did not have access to the [insurer's] computer system." *Id.* at 516-17.

Acuity decries the use of section 56-6-115(b) because this case involved misrepresentations made in a certificate of insurance, not an erroneous application for insurance. Acuity is mistaken. This case involved a mistake in each renewed policy following Plaintiffs' request for building coverage. Like the insured in *Tarrant*, Plaintiffs claimed that they relied on USIG to provide the insurance coverage they requested and that as a result of USIG's mistake, the coverage was not provided. Plaintiffs simply relied on the certificate of insurance as tangible evidence that their instructions had been followed. With these considerations in mind, we hold that the jury instruction was relevant and applicable.

## D. & E.

A trial court is given wide latitude in granting a motion for a new trial as the thirteenth juror, and appellate courts will not overturn such decision unless there has been an abuse of discretion. *See Miller v. Doe*, 873 S.W.2d 346 (Tenn. Ct. App.1993). When acting as the

thirteenth juror in considering a motion for new trial, the trial court must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence. *See Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999). If, after weighing the evidence, the trial court is satisfied with the jury's verdict, it must approve the verdict. *See Ridings v. Norfolk Southern Ry. Co.*, 894 S.W.2d 281, 288 (Tenn. Ct. App. 1994).

Our ability to reverse a trial court's approval or denial of a new trial as a thirteenth juror is strictly limited to cases of manifest abuse of its broad discretion, as clearly demonstrated by the trial court's comments or discussion of its decision regarding the motion for new trial. However, if the trial court provides no such comments or discussion or else merely recites the appropriate legal standard to apply in announcing its decision on a motion for a new trial, e.g. that it has "made an independent examination of the evidence presented and conclude[s] that it preponderates in favor of the verdict of the jury and consequently overrule[s] the motion," we must assume the trial court appropriately exercised its function as the thirteenth juror. *Hatcher v. Dickman*, 700 S.W.2d 898, 900 (Tenn. Ct. App. 1985). In the case at bar, the trial court stated,

> The [c]ourt finds that many of the issues raised by [Acuity] in its [motion for new trial and motion for judgment notwithstanding the verdict] were the same issues considered in [Acuity's] Motion for Summary Judgment by Chancellor Jerri Bryant and were denied. Likewise[,] this [c]ourt considered these same grounds in [the motion for a directed verdict] and denied said motions. The [c]ourt finds that the requisite grounds for a new trial or [judgment notwithstanding the verdict] have not been established by [Acuity].

The court then ratified and affirmed the jury's findings. Having reviewed the trial court's comments and applicable law, we cannot conclude that the trial court abused its discretion in its role as the thirteenth juror in finding the evidence supported the jury's verdict.

Likewise, once a trial court approves a jury verdict, this court's review of the jury verdict itself is stringent. *See Shropshire v. Roach*, No. M2007-02593-COA-R3-CV, 2009 WL 230236, at *3 (Tenn. Ct. App. Jan. 30, 2009). This court employs the material evidence rule. *Gibson v. Francis*, No. E2003-02226-COA-R3-CV, 2004 WL 1488541, at *2 (Tenn. Ct. App. June 30, 2004). Ultimately, our task is to review the record to determine whether it contains material evidence to support the jury's verdict. *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994).

In this case, the jury heard evidence to support Acuity's position that USIG's actions were beyond the scope of the agency agreement, that Plaintiffs never procured building

coverage, and that Plaintiffs could not recover pursuant to the policy even if they had procured such coverage because they intentionally set the fire. Nevertheless, the jury reached an opposite result. As this court has previously noted, "if there is material evidence to support the verdict, the verdict and judgment must be affirmed, even if there is testimony or evidence supporting the appellant's position." *Dixon v. Cobb*, No. M2006-00850-COA-R3-CV, 2007 WL 2089748, at *4 (Tenn. Ct. App. July 12, 2007) (citing *City of Chattanooga v. Ballew*, 354 S.W.2d 806, 806 (Tenn. Ct. App. 1961)). Plaintiffs argued that they negotiated for and believed that they received insurance coverage for the purchase of their new building as evidenced by the certificate of insurance and the slight increase in premiums. They also denied any involvement in the fire and offered a plausible explanation for the suspicious nature of the fire, namely an irate employee set the building on fire. Having reviewed the record, we conclude that the testimony presented at trial provided material evidence for a jury to rule in favor of Plaintiffs.

F.

CCS asserts that the trial court erred in declining its request to treble the damages pursuant to the TCPA. The TCPA provides, in pertinent part,

> (a)(1) Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in §47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages.
>
> * * *
>
> (3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court *may* award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper, except that the court may not award exemplary or punitive damages for the same unfair or deceptive practice.

Tenn. Code Ann. § 47-18-109(a)(1), (3) (emphasis added). The legislature did not define the term actual damages as it pertains to an award of trebled damages pursuant to Tennessee Code Annotated section 47-18-109. *Discover Bank v. Morgan*, 363 S.W.3d 479, 496-98 (Tenn. 2012) (holding that a plaintiff could recover actual damages under the TCPA for loss of credit if the plaintiff submitted sufficient proof of the amount damages requested). Here, the jury assessed damages at $156,200. Having reviewed the evidence, we conclude that the trial court did not err in declining to treble the damages assessed by the jury.

-13-

G.

Plaintiffs argue that the trial court erred in admitting the deposition testimony of Mr. Parish because he was not an unavailable witness. Having affirmed the judgment against Acuity, this issue is pretermitted.

## IV. CONCLUSION

The judgment of the trial court is affirmed. This case is remanded to the trial court for enforcement of the court's judgment and collection of costs assessed below. Costs of the appeal are taxed to the appellant, Acuity Mutual Insurance Company.

_____
JOHN W. McCLARTY, JUDGE